2005-NMCA-068

114 P.3d 306

**H–B–S PARTNERSHIP, a New Mexico general partnership; Arnold Horwitch; Burton Horwitch; Elliott Horwitch; and Stuart C. Sherman, Plaintiffs–Appellants/Cross–Appellees,**

**and**

**NZ EDP, Ltd. Co., a New Mexico limited liability company, Intervenor,**

**v.**

**AIRCOA HOSPITALITY SERVICES, INC., a Delaware corporation, Defendant–Appellee/Cross–Appellant.**

**No. 23,746.**

Court of Appeals of New Mexico.

April 4, 2005.

Certiorari Denied, No. 29,186, May 31, 2005.

**628**

John M. Eaves, John G. Baugh, C. Shannon Bacon, Eaves, Bardacke, Baugh, Kierst & Larson, P.A., Kerry C. Kiernan, The Blake Law Firm, P.C., Albuquerque, NM, for Appellants/Cross–Appellees.

W. Spencer Reid, Thomas C. Bird, Keleher & McLeod, P.A., Albuquerque, NM, for Appellee/Cross–Appellant.

## OPINION

BUSTAMANTE, Chief Judge.

{1} This case involves the interpretation of a right of first refusal (ROFR) provision in a limited partnership agreement. The district court decided the ROFR was triggered when the corporate great-great-grandparent of one of the general partners was sold in a stock transfer transaction. Defendant appeals the district court's basic decision that the ROFR was triggered. Plaintiffs and Defendant below both appeal from the district court's calculation of the price required to exercise the ROFR. We affirm.

## FACTS AND PROCEEDINGS

{2} We first provide an overview of the relevant corporate and partnership structures.[1] The El Dorado Partnership (EDP) is a New Mexico limited partnership formed in 1984 for the purpose of acquiring an interest in the El Dorado Hotel (the Hotel) in Santa Fe, New Mexico. EDP owns a 25% interest in another partnership, Guardian Santa Fe Partnership, which actually owns the Hotel. EDP has three partners: Defendant Aircoa Hospitality Services, Inc. (AHS) is a Delaware Corporation and owns a 40% general partnership interest. NZ EDP, Ltd. Company (NZ) is a New Mexico limited liability company which also owns a 40% general partnership interest. Not a party to the action initially, NZ intervened as a Plaintiff seeking to enforce the ROFR. Plaintiff H–B–S Partnership (H–B–S) is a New Mexico limited partnership which in turn owns a 20% limited partnership interest in EDP. H–B–S was the original plaintiff in this action.

{3} The issues in this case revolve around the ROFR language of the EDP Partnership Agreement. The relevant provisions of the agreement provide:

9.1 *Offer to Other Partner.* Except as provided in section 9.6, if at any time a Partner proposes to sell, assign, or otherwise dispose of all or any part of his interest in the Partnership, such Partner ("Offeror") shall first make a written offer to sell such Partnership interest to the other Partners on the same terms and conditions on which the Offeror proposes to transfer the Partnership interest. Such offer shall state the name of the proposed transferee and all the terms and conditions of the

---

**1.** As a visual aid to understanding, we attach two organizational charts. Appendix 1 shows the corporate/ownership structure just prior to the sale. Appendix 2 depicts the structure after the sale.

proposed transfer, including the price to the proposed transferee, and shall be accompanied by a copy of the offer from the proposed transferee if available.

9.2 *Acceptance of Offer.* The other Partners shall have the right for a period of 30 days after receipt of the offer from the Offeror to elect to purchase all of the Partnership interest offered. In exercising their right to purchase such Partners may divide the offered interest in any manner to which they all agree and in the absence of agreement, the offered interest shall be divided among such other Partners in such group in proportion to their relative Sharing Ratios; provided, however, the right to purchase shall not be effective unless such Partners elect to purchase all of the Partnership interest offered. To exercise its right to purchase, a Partner shall give written notice to the Offeror. Upon exercise of a right to purchase and provided the right is exercised with respect to all of the Partnership interest offered, the purchase shall be closed and payment made on the same terms as applicable to the offer received by the Offeror from the proposed transferee.

9.3 *Failure to Accept Offer.* If the other Partners do not elect to purchase all of the Partnership interest offered in accordance with the provisions of sections 9.2, the Offeror may transfer the offered interest to the proposed transferee named in the offer to the other Partners. However, if that transfer is not made within 90 days after the end of the 30 day period provided for in section 9.2, a new offer shall be made to the other Partners and the provisions of this Article 9 shall again apply.

9.4 *Cash Equivalents.* If the proposed offer under section 9.1 is for consideration other than cash or cash plus deferred payments of cash, the purchasing Partners may pay the cash equivalent of such other consideration. The Offeror and the purchasing Partners shall attempt to agree upon a cash equivalent of such other consideration. If they cannot agree and such disagreement continues for a period of ten business days, any of such Partners may, by five days' written notice to the others, initiate arbitration proceed-

ings for determination of the cash equivalent in Denver, Colorado, according to the rules and practices of The American Arbitration Association with respect to a sole arbitrator. The arbitrator shall determine the cash equivalent without regard to income tax consequences to the Offeror as a result of receiving cash rather than other consideration. The purchasing Partners may give notice of election to purchase to the Offeror within ten days after the arbitrator's decision, if they choose to purchase the interest.

9.5 *Direct and Indirect Transfers.* For purposes of this agreement, restrictions upon the sale, assignment or disposition of a Partner's interest shall extend to any direct or indirect transfer including, without limitation: (a) an involuntary transfer such as a transfer pursuant to a foreclosure sale; (b) a transfer resulting by operation of law, or as a result of any merger, consolidation or similar action; and (c) the transfer of an equity interest in a Partner which is a corporation, partnership or other entity if the transfer of the equity interest results in a change in control of such corporation, partnership or other entity. The transfer of a limited partner interest in a Partner which is a limited partnership shall not be considered to result in a change in control of such limited partnership for purposes of the prior sentence.

9.6 *Permitted Transfers.* Notwithstanding the above, the following transfers shall be permitted without first offering the interest to the other Partners or otherwise complying with this Article 9.

(a) A transfer of all or a portion of a Partner's interest in the Partnership to (i) any partner of a Partner who or which has such status as of the date of this Agreement, including any shareholders or partners of such partner, (ii) an affiliate of such Partner, (iii) a limited or general partnership, provided that the transferor is a general partner of such transferee partnership and such transferee partnership shall be subject to the restrictions on transfer provided in this agreement; (iv) a revocable living trust established by a Partner who is

a natural person; (v) the spouse, parents, and lineal descendants of the transferor and any partnership or corporation in which such persons own all of the equity interest; or (vi) the estate, beneficiaries and legatees of a Partner who is a natural person or any partner of a Partner;

. . . .

(c) Horwitch shall have the right to sell all or any part of its interest in the Partnership to such transferees as it determines; provided that such sales are made as part of a single offering pursuant to Regulation D of the Securities Act of 1933, as amended, and sales are made to not more than seven "nonaccredited" investors . . . .

(d) No permitted transferee of a Partner under this section 9.6 shall be admitted as a Partner in the partnership without the written consent of all of the remaining General Partners . . . .

{4} Article 2.7 provides:

2.7 *Affiliate.* An "affiliate" of a Partner is a person or entity that controls, is controlled by or is under common control with such Partner. A person or entity that has a 20 percent or more interest, directly or indirectly, in another person or entity shall be conclusively deemed to be a controlling person.

{5} H–B–S's complaint arose when AHS's corporate great-great-grandparent was sold. As reflected in Appendix 1, AHS was the last in a chain of wholly-owned subsidiaries beginning with Richfield Holding Corporation I (RHC I). The identities of the purchasing entity (or entities) is not germane to our analysis. Suffice it to say that after the sale RHC I was wholly owned by a new corporate parent and AHS acquired a new great-great-great-grandparent, CDL Hotels, Inc. (CDL). *See* Appendix 2. The district court detailed the sale in its findings of fact and none of the parties question its ruling in this regard.

{6} The terms of the proposed sale were first outlined in a Memorandum of General Agreement in which the seller proposed to sell a 100% equity interest in RHC I "including its interest in . . . the assets more specifically detailed in Schedule 'A'." Among the scheduled assets was a "40% equity interest in the El Dorado Partnership, Limited." The final purchase agreement included a schedule of all entities being transferred including the seller's interest in EDP. One of the "Minimum Condition[s]" to the final purchase agreement was receipt of a "Consent to transfer of Shares and [W]aiver of Right of First Refusal" from William Zechendorf, Jr. and "Horwich [sic] Brothers Number Three." Zechendorf and the Horwitch Brothers Number Three (a general partnership) were the named partners in the Agreement and Certificate of Limited Partnership for EDP. They are the predecessors in interest to H–B–S and NZ.

{7} H–B–S was first informed of the proposed sale by a "Form of Consent of [EDP]," which it received from AHS on December 2, 1999, for "review and comment." The relevant part of the consent form read:

D. The Outside Partners [HBS and NZ EDP] understand that certain indirect owners of [AFS] plan to transfer their interests in [AFS] to CDL Hotels USA, Inc. or its affiliates ("*CDL* ") . . . [and] the Outside Partners hereby agree as follows:

. . . .

(c) The right of first refusal granted to the Outside Partners under Article 9 of the Partnership Agreement, to the extent it may be construed to apply, is hereby expressly waived in connection with the transfers of interests described above.

H–B–S demanded AHS provide it with a written offer on the same terms and conditions as required by Articles 9.1 and 9.5 of the EDP Agreement, and notified AHS that it fully intended to enforce the ROFR. AHS denied that it was selling "or otherwise disposing of its interest" in EDP or that any interest of its owner, Richfield Hospitality Services, Inc. (RHS), was being transferred. On December 15, 1999, H–B–S was advised that "the parties intend to go forward with the closing of the [RHC I] transaction . . . subject to any right of first refusal H–B–S may have." The sale closed on December 17, 1999.

{8} On that same day, H–B–S filed its complaint seeking actual and punitive dam-

ages, as well as specific performance for the alleged breach of partnership agreement and breach of the implied covenant of good faith and fair dealing. NZ was permitted to intervene. It sought a declaratory judgment, specific performance for breach of partnership agreement, and damages for AHS's breach of fiduciary duty and breach of the good faith duty.

{9} The case was tried to the bench. The parties testified regarding the effect of the sales transaction. After the transfer, the purchaser replaced many of the sold entity's officers and directors; but the same officers and directors served in each entity from RHC I down to and including AHS. The controller of the RHC group of affiliates reported directly to the new owner. The new owner supervised the United States hotel operations, including decisions on budgeting, capital spending, investments, sales and purchases, as well as decisions for the hiring and firing of executive officers, and dispute resolutions.

{10} Each side's accounting expert disputed the starting point for the valuation of AHS's 10% interest in the Hotel.[2] H–B–S's expert, Thomas Burrage, relied on an appraisal performed by PKF Consulting, a firm that the seller and new owner agreed would value the underlying assets involved in the transfer. He testified that the exercise price of $5.3 million for the interest should be based on the market value of the Hotel's real and personal property. AHS's expert, Carl Alongi, opined that the exercise price should be based on the Hotel's business value, the real and personal property plus the value of the contract for the management of the hotel, which PKF Consulting appraised at $5.9 million. Alongi made various adjustments to this figure to arrive at a net exercise price of $3,967,977.

{11} The district court entered judgment for H–B–S and NZ against AHS for specific performance. Relying on Alongi's calculations, it set the exercise price at $3,967,977, less distributions from EDP to AHS since trial, and interest from April 22, 2002. In determining the exercise price, the court de-

nied AHS's request to credit it for money paid to EDP after the closing in settlement of another lawsuit between the partners. The district court dismissed the breach of good faith duty, breach of fiduciary duty, and punitive damages claims. This appeal followed. We only concern ourselves with the right of first refusal and valuation questions, as the dismissal of the other claims is not appealed by any party.

## DISCUSSION

### I. The Right of First Refusal

{12} The first issue is whether the district court erred in concluding that the sales transaction triggered the ROFR. At the trial's end, the district court observed that the contract was unambiguous and that the ROFR provision was intended to be broadly applied under the language of Article 9.5 to any direct or indirect transfer. Applying that intent to the corporate structure involved (a "single shareholder really at each level up through the level of the sale"), the court indicated that "a reasonable reading of the contract, keeping in mind the purpose that was sought to be protected by this language, indicates that this type of transaction is covered." The district court entered the following findings on this issue:

12. Prior to December 17, 1999, Regal International and its affiliates indirectly owned more than a twenty percent interest in AHS. AHS was a wholly owned subsidiary of Regal International and its affiliates.

. . . .

15. The [CDL] transaction closed on December 17, 1999.

16. After December 17, 1999, Millennium & Copthorne and its affiliates indirectly owned more than a twenty percent interest in AHS. AHS was a wholly owned subsidiary of Millennium & Copthorne and its affiliates.

. . . .

18. The Form of Consent indicated that the "indirect owners" of AHS intended to transfer their interest in AHS to CDL.

---

**2.** The 10% interest is based on the 40% equity interest AHS held in EDP which in turn held a

25% interest in Guardian Santa Fe Partnership, the actual owner of the Hotel.

. . . .

26. The transaction between Regal International and CDL did not result in a direct transfer of the interest of AHS in EDP; the transfer of the interest in EDP was indirect.

{13} Based on these findings, the district court concluded:

3. All provisions of the EDP Agreement at issue in this case are unambiguous.

4. The EDP Agreement creates a right of first refusal as to the direct or indirect transfer of the partnership interest.

5. The right of first refusal is effectuated when there is an indirect transfer of an equity interest in a Partner which is a corporation and that transfer results in a change in control of such corporation.

6. The CDL transfer triggered the right of first refusal under the EDP Agreement.

7. The sale of Regal International's equity interest in AHS was an indirect transfer of the equity interest of AHS in EDP.

. . . .

11. Plaintiffs are entitled to specific performance of their right of first refusal.

{14} AHS agrees that the ROFR provisions are unambiguous. The focus of their argument is that there was no "transfer" of its stock or its partnership interest in EDP that could trigger the ROFR provisions, as a matter of law. Arguing for a narrow construction of the ROFR provision because it is a restraint on the alienation of stock, AHS gives three reasons for reversal. First, it urges us to apply the rule that the sale of stock in a subsidiary is not a sale of the subsidiary's assets; when a subsidiary is sold by a parent, the subsidiary retains ownership of its assets. *See Capital Parks, Inc. v. S.E. Adver. & Sales Sys., Inc.,* 30 F.3d 627, 629 (5th Cir.1994); *Engel v. Teleprompter Corp.,* 703 F.2d 127, 131 (5th Cir.1983); *LaRose Mkt., Inc. v. Sylvan Ctr., Inc.,* 209 Mich.App. 201, 530 N.W.2d 505, 507 (1995); *Tenneco Inc. v. Enter. Prods. Co.,* 925 S.W.2d 640, 644–45 (Tex.1996). AHS argues that, since only stock in its corporate great-great-grandparent was sold, the transfer did not affect any of that corporation's assets or the assets of its subsidiaries, down to and including its ownership interest in AHS and its interest in EDP. As such, AHS argues, the district court erred in finding that the new owner indirectly owned more than a 20% controlling interest in AHS and that the sale resulted in an indirect sale of any equity interest in AHS or an indirect transfer of its interest in EDP.

{15} Second, although it conceded at oral argument that there was a change of control, AHS contends that since there was no transfer of any equity interest or ownership, a change of control by itself cannot trigger the ROFR. *See Capital Parks, Inc.,* 30 F.3d at 629; *Engel,* 703 F.2d at 135. AHS construes Article 9.5 to require a showing that there was a transfer of a Partner's interest before the issue of control becomes relevant.

{16} Third, AHS argues that the district court disregarded the doctrine of corporate separateness in finding that the ROFR applied to a corporate structure involving a "single shareholder really at each level up through the level of the sale." It contends that "[m]ere control by the parent corporation is not enough to warrant piercing the corporate veil. Some form of moral culpability attributable to the parent ... is required." *Scott v. AZL Res., Inc.,* 107 N.M. 118, 122, 753 P.2d 897, 901 (1988). AHS asserts that no evidence of improper purpose was shown warranting a piercing—or "reverse piercing"—of five levels of corporations in order to hold AHS liable for the sale of the stock of a remote parent.

{17} H–B–S responds that the corporate veil theory is a false issue, since AHS agreed to be bound by the ROFR in the event 20% or more of its stock was indirectly transferred to an upstream corporation. H–B–S argues that since it seeks to impose liability on AHS alone for its contractual and partnership promises and commitments, no veil piercing or reverse piercing is required.

{18} H–B–S focuses on Article 9 of the partnership agreement, which it argues "was drafted broadly to discuss [transfers] that are not permitted and narrowly to discuss the transactions that are permitted." H–B–

S concedes that Article 9.5 required it to prove: (1) the seller's intent to transfer its equity interest in AHS, (2) that AHS was a corporation or a partnership, and (3) that the transfer resulted in a change of control of AHS. According to H–B–S, a change of control was established in three ways: under the express terms of the partnership agreement; under Generally Accepted Accounting Principles or "GAAP"; and from direct evidence of a change in AHS's officers and directors, along with a change in the ultimate authority to make financial and employment decisions.

{19} Appellate courts review a district court's interpretation of an unambiguous contract de novo. *Campbell v. Millennium Ventures, LLC,* 2002–NMCA–101, ¶ 15, 132 N.M. 733, 55 P.3d 429. Contracts are interpreted to "give force and effect to the intent of the parties." *Medina v. Sunstate Realty, Inc.,* 119 N.M. 136, 138, 889 P.2d 171, 173 (1995). We consider the plain language of the relevant provisions, giving meaning and significance to each word or phrase within the context of the entire contract, as objective evidence of the parties' mutual expression of assent. *Id.; Montoya v. Villa Linda Mall, Ltd.,* 110 N.M. 128, 130, 793 P.2d 258, 260 (1990). A reasonable construction of the usual and customary meaning of the contract language is favored. *Id.*

■ {20} We agree with AHS and the district court that the ROFR provisions are unambiguous; however, we reject AHS's argument in favor of a narrow construction of its terms. AHS urges us to apply a strict or narrow construction of the ROFR on the theory that all restrictions on the alienation of corporate stock should be strictly construed because they are disfavored. *See Kerr v. Porvenir Corp.,* 119 N.M. 262, 264, 889 P.2d 870, 872 (Ct.App.1994). We would be more apt to adopt AHS's position if the ROFR here was similar to that examined in *Kerr,* but it is not. Rather, the ROFR here is essentially identical to the provision we enforced in *Lorentzen v. Smith,* 2000–NMCA–067, ¶¶ 17–18, 129 N.M. 278, 5 P.3d 1082. In *Lorentzen,* we accepted the proposition that a right of first refusal should not be deemed a restraint of alienation as the term is used in the Restatement of Property

so long as the provision describes a reasonable price and sets a reasonable time for exercise of the right. *See id.;* Restatement (Second) of Property: *Donative Transfers* § 4.4 cmt. a (1983). Here, Article 9 of the partnership agreement does no more than give other partners a chance for thirty days to buy, for the same price, what the selling partner is already willing to sell to a third party. We see no improper restraint in this arrangement. As such, we see no reason to construe this contract any differently than any other agreement.

■ {21} The bare language of Article 9 in the Partnership Agreement is extremely broad. In fact, we cannot imagine how the language of a ROFR could be broader. The purchase option is triggered under Article 9.1 if "a Partner proposes to sell, assign, or otherwise dispose of all or any part of his interest in the Partnership." As explained in Article 9.5, the ROFR is triggered by "any direct or indirect transfer including, without limitation: .... the transfer of any equity interest in a Partner which is a corporation, ... if the transfer ... results in a change in control of such corporation." Use of the phrases "any direct or indirect transfer" and "without limitation" clearly evinces a desire by the parties to maximize the reach of the ROFR. Similarly, reference to "the transfer of any equity interest in a Partner" indicates an intent to include changes in stock ownership in partners by sale. This intent is made all the more clear given that transfers by "merger, consolidation or similar action" are separately covered in Article 9.5(b). We agree with the district court that the language and structure of Article 9.5 evince an intent that the ROFR was to be triggered by all changes in ownership of AHS and AHS's corporate body.

{22} AHS concedes that a change in control occurred as a result of the sale, but insists that a "transfer" has not—perhaps cannot—be proven in this case because change of control has no effect on ownership of the subject entity. We agree with AHS that Article 9.5 required H–B–S to show both a transfer and a change of control. We disagree that a "transfer" within the meaning of this ROFR does not include a stock sale

by a remote parent corporation. "Transfer" is itself broadly defined by Article 9.5 to encompass "any direct or indirect transfer" of an equity interest by or in a partner "without limitation." "Transfer" must be interpreted within the context of the ROFR. Given the broadness of the ROFR in general, it must comport with the spirit of the provision to interpret "transfer" broadly. This interpretation of the word is consonant with the general legal definition of "transfer." Interestingly, the concepts of transfer and change of control are inter-related. Black's Law Dictionary defines the verb "transfer" as, "1. To convey or remove from one place or one person to another; to pass or hand over from one to another, esp. to change over the possession or control of." *Black's Law Dictionary* 1536 (8th ed.2004). Black's defines the noun "transfer" as "1. Any mode of disposing of or parting with an asset or an interest in an asset. . . . The term embraces every method—direct or indirect . . . of disposing of or parting with property or with an interest in property." *Id.* at 1535. Thus, the general legal definition of "transfer" is quite broad, and there is no reason why it could not be applied to the sale of stock of the remote corporate parent of a series of wholly-owned subsidiaries in the context of this ROFR and this case.

{23} Since AHS is a wholly-owned subsidiary, a transfer of its stock by its parent would constitute a direct transfer of an "equity interest in a Partner" within the meaning of the ROFR. Transfer of the stock of AHS's corporate parents necessarily constitutes an indirect transfer of an "equity interest *in* a Partner." Since the restriction is "without limitation," the ROFR is triggered regardless of whether the transaction is two or even five tiers removed, so long as it results in a change of that control of AHS. Again, AHS concedes control changed after the sale.

■ {24} The broad language of the ROFR reflects the common purpose of preferential purchase rights in partnership agreements "to prevent the intrusion of an uninvited outsider." *Oregon RSA No. 6, Inc. v. Castle Rock Cellular of Oregon Ltd. P'ship*, 840 F.Supp. 770, 775 (D.Or.1993). Comparing the transfers permitted by the

ROFR confirms an intent to bind the vertical corporate structure of AHS. Article 9.5 restricts transfers that are involuntary, by operation of law, by merger, and by direct or indirect sales of stock in a partner that is a corporation or partnership. But Article 9.5 does not restrict a "transfer of a limited partner interest in a Partner which is a limited partnership." Moreover, transfers to "insiders" are expressly permitted under Article 9.6: with the consent of the other partners, a partner can transfer his interest to a partnership in which he is a partner, or a corporate partner can transfer its interest to an affiliate (a subsidiary or parent corporation as defined in Article 2.3 of the partnership agreement). The intent of these provisions is to prevent a transfer of interest to a non-affiliate, directly or indirectly, without the partners' consent. That undesired scenario is precisely what occurred in the sale of AHS's corporate parents. The preliminary and final sales agreements listed AHS's interest in EDP and the Hotel as assets being sold. The practical effect of this transaction was that H–B–S and NZ had a new controlling partner. "[A] sale is made for purposes of a right of first refusal when there is a transfer for value of a significant interest in the subject property to a stranger who thereby gains substantial control over the subject property." *Williams Gas Processing–Wamsutter Co. v. Union Pac. Res. Co.*, 25 P.3d 1064, 1072 (Wyo.2001) (internal quotation marks and citations omitted). This definition mirrors Article 9.5's requirements, and this transaction met those requirements.

■ {25} We, of course, recognize the general rule that a sale of a subsidiary by a parent corporation is not a sale of the subsidiary's assets, unless the assets are actually transferred. *Capital Parks, Inc.*, 30 F.3d at 629; *Engel*, 703 F.2d at 131; *LaRose Mkt., Inc.*, 530 N.W.2d at 508; *Tenneco Inc.*, 925 S.W.2d at 644–45. Our ruling does no violence to that rule. The dispositive factor in the cases relying on this general rule is the actual terms of the particular ROFR provisions involved. In every instance where the plain terms of the contract limited the ROFR to sales of assets, the courts narrowly interpreted the right and applied the general rule

so that the ROFR was not triggered. *See Capital Parks, Inc. v. Southeastern Adver. & Sales Sys, Inc.,* 864 F.Supp. 14, 15–16 (W.D.Tex.1993) (order), *aff'd by Capital Parks, Inc.,* 30 F.3d at 628 (holding that ROFR for the "purchase of all the . . . stock or substantially all of the operating assets of [defendant's] wholly-owned subsidiary" was not triggered under the provision's plain language where shareholders proposed to sell parent to outside corporation because the right was triggered *only* by an offer to purchase the subsidiary's stock or assets (internal quotation marks omitted)); *Engel,* 703 F.2d at 128, 130, 132, 134–35 (finding that a merger between the surviving parent corporation of defendant subsidiary and an outside corporation was not a transfer of the subsidiary's stock under the plain words of the contract which limited the ROFR to instances when "stockholders propose to sell or otherwise dispose of all or any part of his shares . . . of the corporation"); *Tenneco Inc.,* 925 S.W.2d at 642, 644, 646 (holding that a sale of stock in a corporation to an outsider did not trigger shareholders' purchase option since the option was limited to the sale of an "Ownership Interest" which referred to corporate assets; further, the option did not contain a "change-of-control" provision which the court stated would have restricted sales of stock); *LaRose Mkt., Inc.,* 530 N.W.2d at 507–08 (deciding that the sale of a corporate lessor's stock was not a "sale" of real property triggering lessees' ROFR to purchase the property where plain language limited the option to a " 'bona fide offer to purchase [the] premises' ").

{26} If the ROFR in this case did not include Article 9.5, these cases would apply with full force and we would hold that the ROFR had not been triggered. Article 9.1 speaks generally of a partner selling its "interest in the Partnership." By itself this language refers only to assets and does not readily invoke coverage of sales of the seller's corporate family. Such general language would most appropriately be interpreted in accordance with the general rule AHS relies on. But the ROFR is not limited to Article 9.1, and the addition of Article 9.5 makes other case law more apropos.

{27} In *Continental Cablevision v. United Broadcasting Co.,* the agreement broadly granted the plaintiff

> a [ROFR] to acquire all or any part of the assets . . . (the "System Assets"), [and] a [ROFR] to acquire the shares of stock of [defendant] constituting its controlling capital stock interest (the "Control Stock") in each instance before the System Assets or any shares of the Control Stock may, *directly or indirectly,* be sold or transferred to any third person or persons.

873 F.2d 717, 718 (4th Cir.1989) (emphasis added). The appellate court agreed with the district court that "it would be 'illogical' not to consider a transfer of the parent as an indirect transfer of the wholly-owned subsidiary's controlling capital stock interest[,]" where the object of the agreement was as much affected by an indirect sale of a parent's stock in its subsidiary as a direct sale of stock by the subsidiary. *Id.* at 719.

{28} We find *Continental Cablevision* persuasive in the context of this case. The contract terms here control our decision. In light of the broad language of Article 9.5, expressly restricting both indirect and direct transfers of equity interests, and the clear intent to restrict corporate sales to outsiders, we conclude that the parties bargained for a broader ROFR than parties to whom the general rule has been applied. The general rule will hold true in most cases, but can be trumped by contract language. "New Mexico . . . has a strong public policy of freedom to contract that requires enforcement of contracts unless they clearly contravene some law or rule of public morals." *Berlangieri v. Running Elk Corp.,* 2003–NMSC–024, ¶ 20, 134 N.M. 341, 76 P.3d 1098 (internal quotation marks, citation, and emphasis omitted). We hold that this transaction triggered the ROFR under the express terms of Article 9.5. Because we hold that the parties are bound by their agreement, the corporate separateness doctrine is inapplicable.

## II. The District Court's Valuation is Reasonable and is Supported by Substantial Evidence

{29} At the trial's end, the district court advised the parties that it expected to grant

H–B–S specific performance for breach of a contract. The court explained that since AHS failed to abide by the terms of the agreement, it was difficult to determine the purchase price of its interest. The only reasonable approach in the district court's view was to base the exercise price on the parties' valuation of the underlying assets, the Hotel. The court agreed with AHS's expert, Alongi, that the starting point for the valuation was $5.9 million or 10% of the "business value" of the Hotel, rather than with H–B–S's expert Burrage who opined that the market value of the real and personal Hotel property reflected the actual value assigned by the parties. The court also agreed with Alongi's adjustments and set the exercise price at $3,967,977.

{30} In its findings, the district court adopted this view and elaborated:

23. AHS did not make an offer to sell its interest in EDP to the other partners of EDP at any time at or near the closing of the transaction involving Regal and CDL.

24. AHS did not provide H–B–S with information regarding the terms and conditions of the CDL transaction prior to closing the transaction.

25. The Securities Purchase Agreement sets forth the terms of the transaction. . . .

26. The transaction . . . did not result in a direct transfer of the interest of AHS in EDP; the transfer of the interest in EDP was indirect.

27. Prior to closing, Millennium & Copthorne commissioned the accounting firm of PKF Consulting to value the hotel properties.

28. Both Regal . . . and CDL used the appraisals performed by PKF Consulting to value the interests sold and to calculate the aggregate purchase price.

29. Through the use of the appraisals and certain adjustments, it is possible to determine the value of the interest of AHS in EDP to the buyer in the CDL transaction. The value of the interest to the buyer represents the best assessment of the actual terms and conditions of the sale for purposes of the EDP Agreement.

30. As of the time of trial, the value of the interest of AHS in EDP to the buyer was $3,967,977.00 less any distributions received by AHS subsequent to trial. The calculation of this value is set forth in Exhibit 101 and in the testimony of [AHS's expert,] Carl Alongi.

31. The proper exercise price under the EDP Agreement is $3,967,977.00 less any distributions received by AHS since trial plus interest at 8 3/4% from April 22, 2002.

{31} H–B–S appeals the court's decision to adopt the seller's post-closing valuation of the interest purchased as a starting point for determining the exercise price. It maintains that the purchase accounting method is contrary to the express terms of Article 9.1, which require a partner to offer its shares to partners on "the same terms and conditions it proposed" to sell the interest, *before* the transfer occurs. According to H–B–S, Article 9.1 and general ROFR law dictate that the exercise price should be the market price; the price set by the buyer and seller at the time the sale is negotiated. It contends that the best and only evidence of how the parties valued the property is: (1) the formula used to calculate the aggregate purchase price set forth in Section 2.2 of the Purchase Agreement; (2) PKF Consulting's appraisal of the real property value of the Hotel; and (3) the General Accounting Memorandum, "memorializing the actual intentions of the Buyer and Seller at the time of their negotiations" to base the purchase price on the fair value of the "real estate." H–B–S's expert opined that the appraisal for the real property was $5.3 million. Adding the value of the management contract held by the seller created the business value figure of $5.9 million, which was the starting point for valuation put forth by AHS's expert. Although the buyer acquired the Hotel and the management contract, H–B–S urges that the management contract should not be included in the exercise price, since it has no ROFR in the contract, and it is of no value to H–B–S.

{32} On the contrary, AHS urges that H–B–S has not shown how the district court abused its discretion in weighing the evidence and fashioning an equitable remedy.

AHS argues that the record contains no evidence of the actual negotiations or terms of the proposed sale indicating the value of its partnership interest in EDP. According to AHS, the evidence shows that the buyer booked the value of the 10% interest in the Hotel at $5.9 million and accorded the management contract no separate value. As such, it defends the district court's equitable discretion in determining that this was a fair starting point.

■ {33} Urging de novo review, H–B–S asserts that the district court committed a legal error in applying a purchase accounting standard rather than a fair market value standard as required by the contract. We disagree. There is no contract question. As all parties agree, the EDP contract dictates that, the "Partner ("Offeror") shall first make a written offer to sell such Partnership interest to the other Partners on the same terms and conditions on which the Offeror proposes to transfer the Partnership interest." Because AHS did not comply with the ROFR, there is no direct evidence of the value assigned to the Hotel at the time of the offer. When the district court ruled, it was faced with predictably conflicting evidence. From that evidence the district court had to fashion an equitable remedy. The district court decided that "[t]he value of the interest [in the Hotel] to the buyer represents the best assessment of the actual terms and conditions of the sale for purposes of the EDP Agreement." In this context, valuation methodology is not explicitly controlled by the ROFR. The district court had leeway in reconstructing the "terms and conditions" on which AHS's interest in EDP was transferred. This does not present a legal question of contract interpretation. Rather, it is an issue of discretion and substantial evidence.

{34} We give broad deference to the district court when interpreting and weighing the evidence. See McCauley v. Tom McCauley & Son, Inc., 104 N.M. 523, 527, 724 P.2d 232, 236 (Ct.App.1986). We "review the record to determine whether the evidence supports the court's findings, and apply the substantial evidence test." Id. In reviewing for substantial evidence, we view the evidence in the light most favorable to the prevailing party and disregard evidence or inferences to the contrary. Weidler v. Big J Enters., Inc., 1998–NMCA–021, ¶ 30, 124 N.M. 591, 953 P.2d 1089. "Substantial evidence is such relevant evidence that a reasonable mind would find adequate to support a conclusion." Landavazo v. Sanchez, 111 N.M. 137, 138, 802 P.2d 1283, 1284 (1990).

■ {35} The district court's decision that Alongi's testimony was the best assessment of the contract terms is supported by substantial evidence. In the final Purchase Agreement, the seller expressly agreed to sell its interests for a purchase price based on a post-closing valuation of the underlying assets, and in accordance with GAAP. Under Section 2.2 of the Purchase Agreement, the parties agreed that the preliminary purchase price was "$640,000,000[ ] plus Adjusted Working Capital plus the Intercompany Note Amount" but they also agreed that the final purchase price was "subject to post-Closing adjustment as set forth in Section 2.6." Under Section 2.6, the buyer was to prepare and deliver to the seller, subject to its objections and in compliance with GAAP, an audited balance sheet, adjusted working capital computation, an audited income statement for the entities as of September 30, 1999, and a draft income statement through closing. Section 2.11 of the Purchase Agreement provided, "[t]he Purchase Price shall be allocated using a method which shall be reasonably agreed to among the Parties and consistent with the appraisal report of PKF Consulting and all Parties shall file all relevant Tax Returns in a manner which shall be consistent with such allocation."

{36} In accordance with the Purchase Agreement, the buyer's parent company retained PKF Consulting to prepare an appraisal of the Hotel. The appraisal set the market value in the real and personal property at $53.1 million and the market value inclusive of business operations at $58.9 million. The seller's 10% share was $5.3 and $5.9 million, respectively.

{37} Also in accordance with the Agreement, an accounting firm (KPMG) performed a post-closing audit and prepared a "Purchase Accounting Memo." An accounting

638

partner at KPMG who audited the buyer's valuation testified that the Purchase Accounting Memo described how the buyer allocated the purchase price. It indicates that

> M & C [buyer] began with the purchase price and assigned values to the non-hotel assets purchased (ie [sic] the management company assets, investments accounted for under the equity method of accounting, current assets, liabilities and other identifiable assets & liabilities) with the balance of the purchase price assigned to the hotel assets purchased (land, building, fixtures).

KPMG found that the buyer assigned no value to the management company and contracts since it was a break-even business and the contracts were cancelable with notice and without penalty.

> M & C has represented that they did not pay any amounts for these businesses and the purchase price was determined based on the fair value of the real estate. From M & C's point of view, they have an existing management company infrastructure in place and did not need or want this business when they acquired it from Regal. They had to acquire this business to get the deal done with Regal.

The buyer assigned a value of $3,859,000 to its investment in the Hotel (10% interest). For auditing purposes, KPMG recalculated the seller's assigned value using PKF Consulting's $5.9 million appraisal and determined that the buyer's "assigned values appear reasonable."

{38} In addition, the buyer's senior vice-president of finance who participated in the purchase price allocation for the Hotel interest, testified that the estimated fair market value and purchase price of the interest was $5.9 million. The buyer's documents list $5.9 million as its valuation of EDP's interest. Significantly, Alongi's adjusted exercise price through December 17, 2001, which started with the $5.9 million, was $3,854,821, a value that is strikingly close to the buyer's own "assigned value" as of December 31, 2000.

{39} Although the isolated statement that the buyer bought "only the real estate" lends support to H–B–S's argument for the $5.3 million exercise price, the Purchase Accounting Memo, when read in its entirety, the supporting documents, and the non-expert and expert testimony support the district court's conclusion that the best assessment of the actual terms and conditions of the transaction is that the purchase price for the Hotel was based on its business value of $5.9 million. Aside from the H–B–S expert's use of the $5.3 million price taken from the PKF Consulting appraisal, H–B–S presented no other evidence supporting the $5.3 million exercise price. In fact, the sole witness for the $5.3 million price conceded that starting at $5.9 in the valuation of a 10% interest in the Hotel was not unreasonable.

### III. $695,638.27 "Capital Contribution" for Settlement

{40} In determining the exercise price, the district court declined AHS's request to credit it $695,638.27 paid to EDP and distributed to H–B–S pursuant to a settlement agreement resolving a separate lawsuit between the parties. The district court deemed it inconsistent to factor in these funds and determined that it was impossible to value the funds which, in any event, "would only be available at dissolution."

{41} AHS argues that it is entitled to be reimbursed for any capital imbalances under Article 6.2 of the EDP Agreement. Since settlement occurred after closing, AHS contends that the buyer was actually liable for the amount and that money was included in the purchase price. According to AHS, fairness dictates that H–B–S should not be paid twice. AHS cites no evidence that the buyer agreed to pay any of the legal obligations between EDP partners as such, or that the purchase price was adjusted specifically to account for the settlement payment.

{42} Both the district court's valuation and its equitable remedy are reviewed under an abuse of discretion standard for substantial evidence. *Collado v. City of Albuquerque,* 2002–NMCA–048, ¶ 21, 132 N.M. 133, 45 P.3d 73; *Sanchez v. Saylor,* 2000–NMCA–099, ¶ 12, 129 N.M. 742, 13 P.3d 960. We agree with the district court.

{43} The district court perceived its task to be enforcement of the ROFR. Article 9.1 of the ROFR generally requires a selling

partner to offer to sell "to the other Partners on the same terms and conditions on which the [selling partner] proposes to transfer the Partnership interest." The district court undertook to reconstruct the value ascribed to the Hotel (and thus EDP's interest in the Hotel) in the sale by the buyer and seller. The district court relied on the allocated valuations agreed to between the seller and buyer. The aggregate price was to be adjusted for working capital accounts and intercompany notes. No one argues it was not. From the district court's viewpoint, the number it derived was the best estimate available post-sale for the terms on which the selling partner (AHS) proposed to "transfer its Partnership Interest." Further adjustments designed to enforce a settlement achieved post-sale would be inconsistent with enforcement of the ROFR as of the sale date. We cannot disagree with the district court's logic.

## CONCLUSION

{44} We hold that the sale of AHS's corporate great-great-grandparent was an "indirect transfer" of equity interest in AHS within the meaning of this contract triggering the ROFR. Further, we affirm the exercise price set by the district court.

{45} **IT IS SO ORDERED.**

WE CONCUR: CYNTHIA A. FRY and RODERICK T. KENNEDY, Judges.

# APPENDIX 1

ORGANIZATION BEFORE 1999 SALE
OF STOCK OF RICHFIELD HOLDINGS CORPORATION I

| Century City Holdings, Ltd. |
| (Hong Kong) (publicly traded) |

| Paliburg Holdings, Ltd |
| (Hong Kong) |
| 68% (publicly traded) |

| Regal Hotels International Holdings Limited |
| (Bermuda) |
| 100% |

| Regal International (BVI) Holdings Limited |
| (British Virgin Islands) |
| 100% |

| Regal Hotels (Holdings) Limited |
| (Hong Kong) |
| 100% |

| Novolane B.V. |
| (Netherlands) |
| 49.77% Common |

100%

| Regal International Limited |
| (British Virgin Islands) |
| 45.58% |

| Malabo, Inc. |
| (British Virgin Islands) |
| 4 65% |

| Richfield Holdings Corporation I |
| (Delaware) |
| 100% |

| Richfield Holdings Corporation II |
| (Delaware) |
| 100% |

| Richfield Holdings, Inc. |
| (Colorado) |
| 100% (formerly ACI) |

| Richfield Hospitality Services, Inc. |
| (Delaware) |
| 100% |

| AIRCOA Hospitality Services, Inc. |
| (Delaware) |
| 40% M.G.P. (assignment from AEI) |

| JIBS Partnership |
| (New Mexico) |
| 20% L.P. |

| NZ EDP LLC |
| (New Mexico) |
| 40% G.P. (formerly Zeckendorf) |

| The El Dorado Partnership |
| (New Mexico) |
| 25% |

| Guardian Life Insurance Co. |
| (Colorado) |
| 75% |

| Guardian Santa Fe |
| (Colorado) |
| 100% |

③ Securities sold

DEX081001

| El Dorado Hotel |

DEFENDANT'S EXHIBIT
81

27

# APPENDIX 2

ORGANIZATION IMMEDIATELY AFTER 1999 SALE
OF STOCK OF RICHFIELD HOLDINGS CORPORATION I

Millennium & Copthorne Hotels plc
(United Kingdom) (publicly traded)

M&C Management Services USA Inc.
100%

CDL Hotels USA, Inc
(Delaware)

Richfield Holdings Corporation I
(Delaware)
100% (formerly AGI)

Richfield Holdings Corporation II
(Delaware)
100%

Richfield Holdings, Inc.
(Colorado)
100% (formerly ACI)

Richfield Hospitality Services, Inc.
(Delaware)
100%

AIRCOA Hospitality Services, Inc.
(Delaware)
40% M.G.P. (assignment from AEI)

HBS Partnership
(New Mexico)
20% L.P.

NZ EDP LLC
(New Mexico)
40% (formerly Zeckendorf)

The El Dorado Partnership
(New Mexico)
25%

Guardian Life Insurance Co.
(Colorado)
75%

Guardian Santa Fe
(Colorado)
100%

El Dorado Hotel

▣ Securities sold

DEX082001

DEFENDANT'S
EXHIBIT
**82**

28