# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**CARMINA FUSCO,**

Petitioner-Appellant,

**v.**                                                                    **No. 28,671**

**PODIATRY ASSOCIATES OF NEW MEXICO LTD., and the NEW MEXICO DEPARTMENT OF WORKFORCE SOLUTIONS,**

Respondents-Appellees.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Linda M. Vanzi, District Judge**

Gilpin & Keefe, P.C.
Donald G. Gilpin
Lindsay Van Meter
Albuquerque, NM

for Appellant

Modrall, Sperling, Roehl, Harris & Sisk, P.A.
Patrick Rogers
Nadine E. Shea
Albuquerque, NM

for Appellee Podiatry Associates of N.M.

**MEMORANDUM OPINION**

**SUTIN, Chief Judge.**

Carmina Fusco (Employee) appeals a memorandum opinion and order affirming the denial of unemployment compensation benefits. [RP 396-401] Our notice proposed to affirm. Employee has responded with a timely memorandum in opposition. We have considered her arguments, but we are not persuaded the analysis in our notice is incorrect. Accordingly, we affirm.

**BACKGROUND**

Employee is a podiatrist and worked for Podiatry Associates of New Mexico Ltd. (Employer). At some point, a dispute arose between Employee and Employer over her pay. Employer's position was that Employee's contract entitled her to regular draws every two weeks, but the draws would be adjusted based on actual production. On the other hand, Employee believed she was entitled to the draws, without adjustment, no matter what. She believed that the only allowable adjustment was that she could earn compensation above the regular draw if she produced extra work and income. [RP 49-50]

Employee's employment contract provided for a $3000 "gross draw" per two-week period. [RP 231] It stated that the payment was "in anticipation of collections. Actual employee compensation is 31% (thirty-one [percent]) of gross collections."

[RP 231] The contract also provided that if gross collections exceeded the base draw, additional compensation would be paid. [RP 231] However, if collections did not meet the advanced amount, there would be a "negative carry over" until the base draw was equalized. [RP 231] The contract also stated that "[a]ny amount of additional compensation (positive or negative) at the end of this contract period will be carried over into the next contract period." [RP 231] There was evidence the contract also stated that the employee "is not paid on a salary basis and there is, as such, no additional pay for days not worked." [RP 68]

Dr. Kerbleski, co-owner of Employer, testified that under the standard employment contract, podiatrists were paid a draw every two weeks in anticipation of the collections. He stated that "[t]heir whole compensation is based on what their production is." [RP 92] He testified that he told Employee "repeatedly" he was concerned about her taking her full draw during the three-month period when she was on maternity leave because she would have trouble making it up. [RP 97] He said he expressed his concern prior to her "next contract" that began on March 1, 2006. [RP 115-16; RP 2] He stated that when she returned from maternity leave she worked a reduced schedule. [RP 97] He testified that when they were negotiating the new contract that would begin in September 2006, she was unhappy with the proposed

contract, and she was concerned with the amount of debt that she owed to Employer. [RP 107]

There was evidence that there were meetings in June 2006 about Employee's negative balance. [RP 117] Dr. Simon testified that in June there was a meeting at which paying back her negative balance was discussed. [RP 147] Dr. Simon stated that at that meeting Employee did not claim that her contract did not require paying back the negative balance. [RP 149]

Employer's practice manager, Ms. Ross, testified that Employee told her it was demoralizing to know that she owed the practice money. [RP 158] According to Ms. Ross, Employee "definitely" knew that she owed money. [Id.] In her opinion, Employee understood her current contract and wanted to renegotiate the upcoming contract to forgive the debt. [RP 159-60] It was Ms. Ross's opinion that Employee was aware of the "negative balance" as of June 18, 2006. [RP 160, 162]

By contrast, Employee testified that she believed the $3000 base draw was her salary, and that if she "exceeded a certain amount of money," she would get a "bonus above that." [RP 49] She said there was no language anywhere in the contract stating that she could end up owing money to Employer. [RP 50] Under her interpretation of her contract, she claimed that if she worked one day per month, she would still be

entitled to receive her $3000 per month draw. [RP 71] She claimed that August 2006 was the first time anyone told her that she owed money to Employer. [RP 52] She testified that on August 18, 2006, Dr. Kerbleski told her she owed "20-some-odd-thousand dollars" to the practice and "that he was not going to release any more draws" to her. [RP 54] She thought that being paid during the time she was on maternity leave was a "benefit." [RP 57] She told Dr. Kerbleski that she would not work any more if she was not paid. [RP 62] She said, "Then I'm not working any more, I guess today is my last day." [RP 62]

The administrative law judge [RP 292-94], the Board of Review (the Board) [RP 340-41], and the district court all concluded that Employee did not have good cause for leaving [RP 396-401] and ruled that she is not entitled to benefits. Employee appeals.

**DISCUSSION**

Under NMSA 1978, Section 51-1-7(A)(1) (2005), an employee is disqualified from receiving benefits if it is determined that he or she left employment voluntarily without good cause. "Good cause is established when an individual faces compelling and necessitous circumstances of such magnitude that there is no alternative to leaving gainful employment." *Molenda v. Thomsen*, 108 N.M. 380, 381, 772 P.2d 1303, 1304

(1989). Employee claims she had good cause because she was not being paid by Employer. [DS 1-5] She relies on *Randolph v. New Mexico Employment Security Department*, 108 N.M. 441, 445, 774 P.2d 435, 439 (1989), which held that when an employer does not pay employees, the employee has good cause to quit employment. Employer's position, however, was that because she had taken excessive draws, especially during a three-month maternity leave when she was not working but still took her full draw, she had been overpaid, and owed Employer money. Employer's position was that Employee chose to quit because she was unhappy with the fact that she owed Employer money.

As did the district court, we review whether the Board acted fraudulently, arbitrarily, or capriciously, or whether based on the whole record, the decision is not supported by substantial evidence. *See* Rule 1-077(J) NMRA. "This Court . . . will conduct the same [standard of] review of an administrative order as the district court sitting in its appellate capacity." *Rio Grande Chapter of Sierra Club v. N.M. Mining Comm'n*, 2003-NMSC-005, ¶ 16, 133 N.M. 97, 61 P.3d 806. Under the whole record standard of review, we look at "not only evidence that is favorable, but also [at] evidence that is unfavorable to the agency's determination." *Fitzhugh v. N.M. Dep't of Labor,* 1996-NMSC-044, ¶ 23, 122 N.M. 173, 922 P.2d 555.

**A.    The Employment Contract**

We begin by reviewing the employment contract. Employee argues that Employer's interpretation of the contract was unreasonable and that it did not state that an employee might owe money. We reject this argument. The contract expressly set up a system of base pay, to be adjusted depending on the amount of income generated by Employee. It expressly provided that an employee could make more than the base pay, but that adjustments—a "negative carry over"—would occur if Employee did not generate enough income to cover the base pay. As the district court noted, Employee did not offer any other construction of the contract language stating "[a]ny month in which collections do not meet the advanced amount . . . will result in a negative carry over into subsequent months until base draw is equalized at 31% of collections." [RP 407 (¶ 9)] We hold that the Board's and the district court's interpretation of the contract is reasonable, consistent with the plain language of the contract, and is supported by the evidence. *See H-B-S P'ship v. Aircoa Hospitality Servs., Inc.*, 2005-NMCA-068, ¶ 19, 137 N.M. 626, 114 P.3d 306 (stating that contracts are interpreted consistently with their plain meaning, giving meaning to each word or phrase within the context of the entire contract, and are given a reasonable construction).

By contrast, Employee's interpretation was that she would be entitled to regular, full draws even if she worked as little as one day per month. [RP 71] This interpretation of the contract is unsupported by the language of the contract, would entitle an employee to payment without commensurate work, and is an absurd result. *See Rummel v. Lexington Ins. Co.*, 1997-NMSC-041, ¶ 27, 123 N.M. 752, 945 P.2d 970 (stating that the rules of contract construction prohibit an absurd interpretation).

Finally, Employee relies on Restatement of Contracts § 201 in support of her interpretation of the contract. [MIO 10] This argument was not made below. Consequently, we do not review this argument. *See Campos Enters., Inc. v. Edwin K. Williams & Co.*, 1998-NMCA-131, ¶ 12, 125 N.M. 691, 964 P.2d 855 (stating that "[t]his Court reviews the case litigated below, not the case that is fleshed out for the first time on appeal" and that we will not review allegations and arguments not before the district court (alteration omitted) (internal quotation marks and citation omitted)).

Viewing the whole record, we conclude that the Board's and the district court's interpretation of the contract is not arbitrary or capricious. Employee's claim that she was being asked to work without pay is dependent on her construction. Because we reject Employee's interpretation of the contract, we reject the argument that she was being required to work without pay.

8

**B.      Good Cause**

We now turn to the Board's and the district court's conclusion that Employee left without good cause. In her memorandum, Employee argues that she was unaware of the contract provision and that there was a change in the method of compensation. [MIO 8]  This argument is based on language in *Davis v. N.M. Employment Sec. Dep't*, 105 N.M. 55, 56, 728 P.2d 465, 466 (1986), that "[t]o assert successfully that the employment became so unsuitable as to be good cause for leaving, the employee must prove that employment conditions changed or that he was deceived or unaware of such conditions when he entered employment." *Davis* holds that the employee was not entitled to benefits because "[t]here is no evidence in the record that employment conditions changed or that petitioner was deceived when he entered . . . employment." *Id.* at 56-57, 728 P.2d at 466-67. Employee argues that she did not know of the conditions, that the conditions changed, and that she left after she was told she would have to work without taking a draw. [MIO 14] Employee claims that she had to work without pay and therefore had good cause for leaving.

We are not persuaded.  Initially, we note that Employee made no argument below that she was deceived. That argument is not preserved. *See Campos Enters., Inc.*, 1998-NMCA-131, ¶ 12.

9

We also reject Employee's argument that the conditions of compensation changed. There was evidence that during the summer of 2006 she was aware she owed money to Employer and attempted to negotiate forgiveness of her debt when she negotiated a new contract, which would have begun in September 2006. There is also evidence that she was told of the problem from the accruing negative balance, expressed dismay about it, and responded by leaving. There is evidence to support a conclusion that she quit on August 18, 2006, because she was unhappy about the situation. Consequently, there is substantial evidence to support the conclusion that the conditions of her contract never changed and she knew all along what her contract required. Reviewing the whole record, we conclude that it supports the conclusion that Employee did not have good cause for quitting. *See Davis*, 105 N.M. at 56-57, 728 P.2d at 466-67 (holding that where claimant, a salesman, quit because he was unhappy with his commissions, and did not show that there was a substantial change or misrepresentation in the method of compensation, did not demonstrate good cause).

For these reasons, we disagree with Employee's argument that she was faced with compelling and necessitous circumstances of such magnitude that she had no alternative to leaving gainful employment. *See Molenda*, 108 N.M. at 381, 772 P.2d

10

at 1304. We recognize that Employee's testimony was that she felt she was being treated unfairly and that she disagreed with Employer's interpretation of the contract. However, the fact finder was not required to accept her version of the facts. *Cf. State v. Rojo*, 1999-NMSC-001, ¶ 19, 126 N.M. 438, 971 P.2d 829 (stating that the jury is free to reject a defendant's version of the facts). Applying the whole record standard of review, we conclude that the district court's decision is not arbitrary or capricious, and is supported by substantial evidence.

## C.    Public Policy

Finally, Employee contends that if the contract is interpreted in Employer's favor, then it violates public policy. From Employee's amended petition for certiorari filed in the district court, we understand Employee's argument may be that under Employer's interpretation of the contract, an employee can be forced to work for free which results in indentured servitude. [RP 377-81] We disagree. Parties are free to create the terms of their contract. *See Gen. Elec. Credit Co. v. Tidenberg*, 78 N.M. 59, 62, 428 P.2d 33, 36 (1967) (recognizing that public policy encourages freedom of contract between competent parties and that contracts will be enforced unless they contravene public policy). Here, the contract, signed by Employee, provides for a regular base draw, which was then adjusted depending on income produced. We see

nothing in such an arrangement that would be against public policy. It did not create indentured servitude, and as we have discussed, Employee was not forced to work without pay. Therefore, disallowing benefits is not contrary to the policy of unemployment compensation or to public policy.

For these reasons, we affirm the denial of benefits.

**IT IS SO ORDERED.**


_____

**JONATHAN B. SUTIN, Chief Judge**

**WE CONCUR:**


_____

**MICHAEL D. BUSTAMANTE, Judge**


_____

**MICHAEL E. VIGIL, Judge**