### ILLINOIS SURETY CO. v. O'BRIEN.

(Circuit Court of Appeals, Sixth Circuit.   June 8, 1915.)

No. 2631.

1. LANDLORD AND TENANT ⚬⟞159—DAMAGES FOR BREACH OF GROUND LEASE—TITLE OF LESSOR.

A ground lease for 97 years required the lessee to erect a building during the first year, and to secure such agreement he gave a surety bond. He failed to erect the building, and after two years the lessor terminated the lease under its terms for default in the payment of rent. *Held*, that

⚬⟞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

the measure of damages for which the surety was liable for failure of the lessee to erect the building was not different because the lessor was himself a lessee for 99 years, and not owner of the fee.

[Ed. Note.—For other cases, see Landlord and Tenant, Cent. Dig. §§ 573, 608, 611; Dec. Dig. ☜159.]

2. LANDLORD AND TENANT ☜111—RENT—DUTY OF LANDLORD ON DEFAULT.

A landlord is under no obligation to a tenant or to his surety to declare a forfeiture of the lease and re-enter on a default in the payment of rent, at least unless the facts indicate that the tenant has abandoned the lease.

[Ed. Note.—For other cases, see Landlord and Tenant, Cent. Dig. § 336; Dec. Dig. ☜111.]

3. LANDLORD AND TENANT ☜199½—ACTION FOR RENT—DEFENSES.

That there was an outstanding lease having a short time to run on property leased for 97 years is not a defense to an action for rent against the surety for the second lessee, where it is not shown that the first lessee was in possession or claimed the right of possession, and the second lessee paid the rent for the time covered by the first lease without objection.

[Ed. Note.—For other cases, see Landlord and Tenant, Cent. Dig. § 761; Dec. Dig. ☜199½.]

4. WORDS AND PHRASES—"LOT."

The word "lot," as used in building ordinances, held to mean a parcel of land which, whether covering more or less than a platted lot, is purchased or leased and then occupied as one parcel for building purposes.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Lot.]

5. EVIDENCE ☜437—PAROL EVIDENCE TO ADD TO LEASE.

The fact that prior to the execution of a long term lease of city property, which required the lessee to erect a building of designated dimensions and material, the lessee had contemplated building a hotel on the property, which was known to the lessor, does not render parol evidence admissible to invalidate the lease by showing that the building described therein was to be a hotel, and that as such, it would be in violation of then existing building ordinances, where the use to be made of the building was not stated in the lease, but it was expressly provided that in its erection the lessee should comply with all laws and ordinances, and especially where there is no evidence that the ordinances had in fact interfered with the erection of the agreed building.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 2025–2029; Dec. Dig. ☜437.]

6. CONTRACTS ☜141—EXCUSES FOR NONPERFORMANCE—ILLEGALITY.

One who refuses to perform a contract on the ground that it is illegal must carry the burden of showing the illegality, and it is not sufficient to create confusion and suggest doubts as to its legality.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 461, 1760, 1761, 1785; Dec. Dig. ☜141.]

In Error to the District Court of the United States for the Eastern Division of the Northern District of Ohio; William R. Day, Judge.

Action at law by P. C. O'Brien against the Illinois Surety Company. Judgment for plaintiff, and defendant brings error. Affirmed.

F. J. Wing, of Cleveland, Ohio, for plaintiff in error.

A. A. Stearns, of Cleveland, Ohio, for defendant in error.

Before WARRINGTON and DENISON, Circuit Judges, and EVANS, District Judge.

☜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

DENISON, Circuit Judge. When this case was here before (O'Brien v. Illinois Co., 203 Fed. 436, 121 C. C. A. 546) we reviewed the judgment which had sustained a demurrer to the petition. It then appeared that O'Brien had leased a certain lot to Nolan for 97 years, commencing in January, 1907; that Nolan, as lessee, had agreed to pay a specified rental and to erect at once a described building; that the surety company had guaranteed the performance of Nolan's promise to erect the building; that it had not been erected, and that the agreed rent had not been paid; and that, for nonpayment of the rent, O'Brien had terminated the lease and re-entered. It was decided that O'Brien's damages against the surety company on its bond were to be measured by the value which the building, if erected, would have been to him as security for the performance of Nolan's rental and other covenants in the lease. After the case was remanded, an answer was filed and a trial on the merits had. It appeared that the building would have cost more than $7,000, and that the rents and other payments which had become due from Nolan before forfeiture and re-entry were $5,100, and, accordingly, O'Brien had judgment for $5,000, the full amount of the bond penalty. The surety company brings error, and the record presents four distinct questions.

[1] 1. The fact proved to be that O'Brien was not the owner of the fee, but was himself lessee under a 99-year lease which had run 2 years, and that his lease from the fee owner covered a larger lot, from the rear end of which a parcel was cut out by his lease to Nolan. It is said that the measure of damages which we formulated on the first review contemplated its application as between the fee owner and the lessee, and is inappropriate for use between lessee and sublessee. Clearly, this would be true in many cases, and perhaps in the typical case of a short time lease. In such case, the value which the building would add to the interest in the real estate held by the first lessee would be so much more contingent and practically uncertain than in a case where the building became a part of the fee that the difficulty of determining the damage would be much increased. When we come to consider the peculiar facts now involved, the difference between the case as we formerly supposed it to exist and as it does exist is not substantial, and there is no occasion to change the rule. A leasehold interest for 97 years is often sold as readily as the fee; this building could not be expected to endure for more than 97 years; and we think it is clear enough that such a building, both for purposes of rental and for purposes of resale, would add to the value of the estate of a tenant for 97 years practically as much as it would add to the value of the fee; at any rate, the difference is so merely theoretical that we cannot think there was prejudicial error because the court did not observe such distinction as there may be.

[2] 2. It is urged that O'Brien was at fault in not endeavoring to rerent the premises, and that damages should be minimized accordingly. The rental was payable quarterly, in advance. Nolan paid each of the four quarterly installments accruing during the year 1907. He paid nothing during 1908, nor for the first quarter of 1909. O'Brien thereupon served notice of forfeiture. The lease provided that a 60-day notice should be given, and that, during the 60 days, Nolan

might perform all the conditions in default and thereupon be fully reinstated. During this 60 days, after notice served, the second quarterly installment for 1909, payable in advance, became due. We cannot see that these facts give any room for the application of the rule of duty to minimize damages. It does not appear that Nolan had surrendered or abandoned the premises or forfeited his rights as tenant. His rights could not be cut off until the expiration of 60 days after notice served, and even if it be assumed that O'Brien might have obtained possession earlier, he could not have safely rerented until the close of the 60-day period. Defendant's position, then, amounts to a claim that a landlord is bound to proceed to take possession and rerent with reasonable promptness after the tenant has made default. We think he is under no such obligation, even to the surety for the tenant—at least, unless the facts indicate that the tenant has abandoned the lease. If there were abandonment, or something equivalent, we would have to consider what, if any, duty to rerent fell upon the landlord; not so, under the facts of this record.

[3] 3. Proof was offered and refused to the effect that, at the date of the lease from O'Brien to Nolan, there was outstanding a prior lease from O'Brien—covering the premises, and having still six months to run—whereby Nolan's building operation would have been embarrassed and Nolan's surety was released. It is not made to appear that either Nolan or the surety company was ignorant of this prior lease or that they did not contract with full reference to it; but, passing this objection, there was no proof offered to show that the prior lessee was in possession, or claimed the right of possession, or did in the slightest degree interfere with anything Nolan desired to do, and it affirmatively appeared that Nolan paid the rent for the entire first year, covering this six months period and never made any objection because of this alleged outstanding lease. Under these circumstances, there is no room to claim that either Nolan or the surety company was prejudiced.

4. It is next and finally urged that the building ordinances of Cleveland, in force at the date of the lease, forbade erection of the structure which the lease contemplated, and hence that neither Nolan nor his surety can be held to respond for its nonerection. The lease contains an express agreement by Nolan that he will "at all times comply with and fully obey all lawful requirements, rules, laws, and ordinances of all lawfully constituted authorities in erecting said building and in using said premises"; but we do not see that this covenant increased Nolan's existing legal duty. Evidentially, it shows that the subject of ordinances was in the minds of the parties, and so it tends to strengthen the natural presumption that they did not intend by another paragraph of the lease expressly to provide for the erection of a building which the ordinances made unlawful. This other paragraph provided that Nolan should "erect on said premises a brick building of fireproof construction, not less than two stories in height, having a frontage on Eighth street of not less than 60 feet, and a depth of not less than 50 feet; the front of said building to be of pressed brick, with stone trimmings." The parcel leased to Nolan had a westerly frontage on Eighth street of 61.16 feet, and a depth, ex-

tending easterly, of 50.33 feet on one side and 52.39 feet on the other side. The parcel of which O'Brien was lessee, under the underlying lease, had a frontage of about 57 feet on the north side of Prospect street, and ran back northerly about 207 feet to Alpha court or Alpha alley, and was bounded on the east by the public way, called Oak Place in the O'Brien lease and Eighth street in the Nolan lease. Prospect street is assumed to be the full width, 66 feet or more. It thus appears that the Nolan parcel was practically the rear 60 feet of the O'Brien lot, and was bounded on the east and north by intersecting narrow public ways, and that the building contemplated was intended to cover substantially the entire parcel.

For the purposes of this opinion we assume that those sections of the ordinances, which were offered in evidence and the rejection of which is covered by the assignments of error, were in force at the date of making the O'Brien-Nolan lease, and during the entire period permitted for erecting the buildings. They are said to contain three limitations inconsistent with the construction of the prescribed building. These are: (1) That a building designed and intended for a hotel and fronting upon an alley must have its front wall 30 feet distant from the opposite side of the alley, and that since Eighth street was, at this point, only 16 feet wide (and hence an alley), the front wall must be 14 feet back from Eighth street, whereby the building could be only 36 feet deep, instead of 50 feet, as agreed; (2) that a building cannot occupy more than a prescribed percentage of the building site, which percentage is, in all cases, less than would be occupied by this building; (3) that behind every building a yard is required to be left of greater area than would be possible upon this parcel, if this building were put up.

[4] Those provisions of the ordinance which are before us present many points of confusion, and it is difficult to say that they are, in all material respects, intelligible. The first difficulty is to know what they mean by referring to a "lot." Does this mean (a) a parcel which is marked as a lot on some plat or subdivision; or (b) a parcel which, whether covering more or less than a platted lot, is purchased or leased and then occupied as one parcel for building purposes; or (c) does the subdivision go further, so that the word may refer to a fraction cut out from a "lot" under the first or second meanings of the word? Considering together these ordinances which are before us, we believe the second meaning is the true one intended, and that, for the purposes of this case, the lot or building site involved is the one of which O'Brien was lessee, and which was from 57 to 50 feet wide, and extended back 207 feet from Prospect street. Since the parcel leased to Nolan is described as bounded on the north by the wall of an O'Brien building, it is clear that some part of the lot north of and immediately joining the Nolan parcel and extending across the width of the lot, had been built upon by O'Brien; but whether this building extended the entire 147 feet north to Prospect street is matter of conjecture.

The next difficulty is as to the character of "Eighth street" or "Oak Place." The parties, O'Brien and Nolan, called it a street. One section provides that all thoroughfares less than 30 feet in width (and

this was 16) shall be considered alleys, and if less than 16 feet shall be considered court ways. Another section provides that alleys extending back from a full-width street shall, for all purposes of the law, be considered streets for a distance of 66 feet, and, back of that distance, shall be considered court ways. In those sections before us, there are references which show that building upon "court ways" is covered by other sections which were not put in evidence; and hence, "alleys" and "court ways" are distinct from each other. Under the first above definition, all of "Eighth street" is an alley; under the second definition, none of it is. Whether these provisions are reconcilable, or whether that part of Eighth street in question can be considered an "alley," we do not find it necessary to decide, for the reasons hereafter stated.

The next difficulty is as to the character of the O'Brien lot. The ordinance carefully defined four kinds of lots; and this lot is not within any one of the definitions. An "open lot" is one bounded upon all sides by streets; this clearly does not apply. A "corner lot" is one bounded on two sides by streets; even if "Eighth street' is not an alley, but constructively a street for 66 feet back from Prospect street, it is a street on the side for only part of the way—and a part not reaching the spot in question—and so the lot does not respond to this definition. A "through lot" abuts upon a street at each end; and this lot does not. An "interior lot" is bounded on one side by a street, and upon the other three sides by lot lines. This definition does not, at least with certainty, reach the O'Brien lot, bounded upon one side by a street, upon another side by a court, and upon a third side by a street—alley—court way; and since the main purpose of the restrictions now involved must be to secure light and air and easy and safe access for public and private purposes, it cannot be that such a boundary is the equivalent of mere abutting on an adjacent lot.

The restrictions which require that only a certain percentage of the building site shall be occupied do not apply, both because the record does not show how much of the entire lot is or would be built upon, and because such rules, if any, as apply to other than corner lots are evidently modified by other sections not put in evidence. The provisions which require yards behind the buildings apply only, and with specific variations, to corner lots and to interior lots. It is reasonably sure that this is not a "corner lot"; and, as stated above, we are not inclined to consider it an "interior lot." If it is, and if the required yard is not already in existence somewhere on the lot further north (a point not made to appear), we would have a provision requiring a yard at least 10 feet deep along Alpha court, thus narrowing, by 10 feet, the contract frontage on Eighth street; but this section further says:

"Provided, that when a through lot extends to a public or private alley or court way, the yard space for through buildings of the third and fourth grades shall be proportioned as a line court between the buildings and the rear line of the lot. For buildings of other grades, see sections 753 and 757."

Section 753 is in evidence and is foreign to the subject; section 757 is not in evidence. In this proviso, it seems quite apparent that "through" is a misprint for "interior," because it is contained in a

section referring only to interior lots; and, if so, it refers to such a lot as this, if this is an interior lot at all. If, therefore, this section refers to this lot, its true application must be found in the proviso; but we can make no further progress, because the proviso, without help outside of the record, is quite unintelligible.

Buildings are divided into six grades. It is enough to say—selecting merely illustrative uses—that a hotel is in the second grade, an automobile garage in the sixth, and the requirement for 30 feet between the building front and the opposite side of an alley applies to the second class, and not to the sixth. If, therefore, the building in question was to be a hotel (and if Eighth street was an "alley") the frontage would have to be withdrawn 14 feet from Eighth street; but if the building was to be (e. g.) an automobile garage, this restriction did not apply and the building could be made full size.

[5] It is sought to fix the building as coming within class 2 by oral evidence which, taken at its best, tended to show that, before the making of the O'Brien-Nolan lease, Nolan had plans prepared for this building as a hotel, and that O'Brien knew of these plans. This evidence falls short of establishing that the building contract was invalid. O'Brien and Nolan made a written contract for the erection of a building of a certain area, height, and of certain materials, structurally appropriate for hotel or for garage or other permitted use. In the same connection, they agreed that in its erection the building ordinances should be observed. These ordinances (perhaps) forbade the building, if it was a hotel, but (certainly) permitted, if it was a garage. Whatever the intentions of the parties that it was to be a hotel, there was no contract upon that subject. Nolan was at full liberty to change his mind and to erect and use the building for any permitted purpose. This is additionally evident from a subsequent clause (16) of the lease, providing that "*if* a hotel should be conducted in the building" certain otherwise applicable restrictions should be waived. Even defendant's answer does not claim that there was any agreement that the building should be a hotel, but says that it should be classified according to its intended use. Under these circumstances, to say that the contract was unlawful because the prior talks showed it really was for a hotel, and not for (e. g.) a garage, is to vary a written contract by parol evidence of preceding negotiations. We think this evidence was properly rejected; but, for the reasons to be stated, we do not regard the question as very important.

We have gone at length into these ordinance conditions for the purpose only of making clear the situation which we regard as controlling, viz., that, even if the intent to make the building a hotel should be incorporated into the contract, we cannot say that the ordinances made the building contract unlawful. The utmost which can be said is that the right of erection was doubtful and the attempt might provoke a controversy with the authorities. What the outcome might be no one could tell. If such vague and confused provisions are to be enforced at all, a large administrative discretion must exist. Further, such building codes are subject to summary change or suspension by the local Legislature, and it is matter of common knowledge that such changes or suspensions are often made to avoid cases of

hardship. Still further, such building codes, or portions of them, often continue by common consent in a dead-letter condition; and this is especially so where, as here, they undertake to prevent the real estate owner from making full use of his land, and where, to that extent, their constitutionality is, as here, a mooted, but unsettled, question. Still further, although Nolan was sworn as a witness for defendant, he made no claim that the ordinances had, in fact, been found in the way of his agreed building; nor does it in any way appear that, either because of their attempted enforcement or by the mere effect of their silent existence, they did in fact operate as an obstacle.

[6] We have, then, a case where Nolan agreed to erect a building, where the surety company, for a consideration, guaranteed that he would do so; where both principal and surety were equally chargeable with notice of any ordinances which might interfere with the plan; where the contract expressly agreed to observe the ordinances, and so must have been made either in the belief that the ordinances did not apply to the specified building or that, if they did, they would not be enforced or would be changed; where, at the most, the thing agreed to be done was not against good morals or against any general policy, but only against a regulation of doubtful validity; where, upon the whole case it cannot be said that there was any violation even of such regulation, but only that there was a chance that the rule might be so construed as to create such conflict; and, finally, where there is nothing to indicate that the enforcing authorities ever claimed a violation, or that the claim was thought of until astute counsel developed it to meet the exigencies of the defense. Under the situation created by all these concurrent conditions, the surety company (an insurer rather than a surety) cannot be heard to deny its liability on such ground. One who refuses to perform a contract because it is illegal must carry the burden of showing such illegality; merely to create confusion and suggest doubts is not enough, and we cannot say that illegality does appear.

None of the proof offered and rejected was put forward as creating any issue of fact for the jury; and all the argument in this court has been to the effect that the evidence, if accepted and believed, would, as matter of law, establish the invalidity of the contract. We therefore do not consider whether there may lie unnoticed in these proofs some question of fact which might have been brought out as requiring submission.

The judgment is affirmed.