[No. 3038.   Dec. 31, 1927.   Rehearing Denied
Feb. 15, 1928.]

.INGALLS v. PERKINS.

[263 Pac. 761.]

J. D. Atwood, of Roswell, for appellant.

Tomlinson Fort and W. H. McCullough, both of Roswell, for appellee.

## OPINION OF THE COURT

WATSON, J.   Appellee, Mrs. Perkins, operated a sanitorium at Roswell. She had a contract with the United States Public Health Service for the care of disabled veterans. By it she agreed to furnish them the best ward treatment her hospital afforded, and good and sufficient quarters, subsistence, medical and surgical attendance, nursing, and necessary medicines, except expensive vaccines and serums, at $2.50 per day per patient. The compensation was later raised to $3 per day. It has been paid in full.

Appellant, a physician, contracted with appellee that he would give such medical attendance and furnish such medicines as she was required to furnish her patients,

and she agreed to pay him therefor 50 cents per day for each patient from the date of his admission to that of his discharge. Appellant performed his contract and, under it, was entitled to $844.50, for which he sued. The court made specific findings and conclusions, upon which he rendered judgment for appellant in the sum of $140.64.

The learned trial judge held that the contract, while legal when made, became illegal upon the subsequent appointment of appellant as designated examiner for the Public Health Service. The sum adjudged was the amount earned prior to such appointment. The sum disallowed, having accrued after such appointment, could not be recovered, the court held, either upon contract or upon quantum meruit; having been earned not only in violation of the Acts of Congress of March 4, 1909 (chapter 321, § 41, 35 Stats. at L. 1097 [18 USCA § 93]), and of August 10, 1917 (chapter 53, § 3, 40 Stats. at L., 276 [U. S. Comp. St. § 3115⅛f]), but also in violation of general principles of public policy. This is the sole question in the appeal.

By the findings it appears that, as designated examiner, appellant's "duties were limited to the examination of ex-service men sent to him for such purpose by the said Public Health Service and the treatment of them in emergency cases prior to their admittance to hospitals, such treatment being subject to the approval of the proper officer of the Public Health Service." His compensation "consisted only of stated fees for the examinations and treatments authorized or approved by the Public Health Service." He "had no duties to perform with respect to the care and treatment and the furnishing of medical attention and medicines to the patients of the said Public Health Service in the hospital of the defendant." But "plaintiff," as examiner, "had authority to recommend the placement of ex-service men examined by him, in contract hospitals, of which defendant's was one, if in his opinion, such hospitalization was necessary." He had also "authority to recommend the discharge of men placed, in contract hospitals in case the patient's condition should so warrant, or upon request of the patient."

We think that the court was in error in holding the contract illegal, as violative of the acts of Congress cited. These statutes are penal, hence to be strictly construed. So construed, we do not think they apply to this case. 24 Attorney General's Opinions, 557; 29 Attorney General's Opinions, 199; U. S. v. Strang, 254 U. S. 491, 41 S. Ct. 165, 65 L. Ed. 368.

The texts disclose many kinds of attempted contract which, in their tendency, are so inimical to the public interest that courts have refused to enforce or recognize them. Yet it is not every possibility of abuse or corruption that will justify it.

"A court should declare a contract void as against public policy only when the case is clear and free from doubt, and the injury to the public is substantial and not theoretical or problematical." Oregon R. R. & Navigation Co. v. Dumas (C. C. A.) 181 F. 781.

"One who refuses to perform a contract because it is illegal must carry the burden of showing such illegality; merely to create confusion and suggest doubts is not enough." Ill. Surety Co. v. O'Brien (C. C. A.) 223 F. 933.

"Though the power of courts to invalidate agreements of parties on grounds of public policy is unquestioned, and is obviously necessary, the impropriety of a transaction should be clear in order to justify the exercise of the power.

" 'If there is one thing more than any other which public policy requires, it is that men of full age and competent understanding shall have the utmost liberty of contracting and that contracts when entered into freely and voluntarily, shall be held good and shall be enforced by courts of justice.' " 3 Williston on Contracts, § 1628.

"It must be borne in mind that the public interest is not well served by indulging baseless suspicions of wrongdoing. Public policy forbids the enforcement of any illegal or immoral contract, but it is equally insistent that those which are lawful and contravene none of its rules be duly enforced and not set aside or held invalid on a bare suspicion of illegality. Courts will not declare a contract void on the ground of public policy unless it clearly appears that the contract is in violation of the public policy of the state. A doubtful matter of public policy is not sufficient to invalidate a contract. An agreement is not void on this ground unless its contravention of public policy is clear and is manifestly injurious to the interests of the state. Freedom of contract is as essential to unrestricted commerce as freedom of competition, and one who asks courts to put restrictions upon the right to contract ought to make it clearly appear that the contract is against public policy." 2 Elliott on Contracts, § 650.

"In a commercial world the public has a very strong interest in the security of transactions and in the enforceability of contracts; and a sound public policy requires the enforcement of all contracts whose subject-matter is not contrary to positive law or to the clear principles of public policy, if they are otherwise valid. There is, undoubtedly, a strong tendency at modern law to restrict the operation of public policy as avoiding contracts, to cases included under recognized legal principles, or under statutes. A free extension of the theory of public policy gives the court power to substitute its own notions for the will of the parties. The courts prefer, in cases not settled by recognized precedents, to use such power only in cases in which the injury to the public is clear. The presumption in doubtful cases is in favor of the validity of the transaction. Still, contracts clearly injurious to the public interests are held invalid, however novel." 2 Page on the Law of Contracts, § 674.

It is not entirely easy to classify this case under any recognized head of illegality on grounds of public policy. Appellee has not expressly attempted to do so. Her contention as to the exact vice of this contract must be arrived at by examining the texts and decisions she cites and relies upon as in point. She cites 2 Elliott on Contracts, §§ 706, 707, dealing with contracts tending to official corruption; also 6 R. C. L. "Contracts," § 144, relating to contracts the tendency of which is to induce officials to violate their duties. No decision cited bears in its facts any similarity to the case at bar. Her principal reliance is upon Levy v. City of Kansas City (C. C. A.) 168 F. 524, 22 L. R. A. (N. S.) 863, and Bay v. Davidson, 133 Iowa, 688, 111 N. W. 25, 9 L. R. A. (N. S.) 1014, 119 Am. St. Rep. 650. In the former case the contract held illegal was a license granted by the city to operate a pool-selling business in the face of a statute prohibiting that form of gambling. The contract involved moral turpitude, and the court left the parties where it found them. In Bay v. Davidson a merchant who had sold merchandise to a city council, of which he was a member, was not allowed to recover because of the incompatibility of his public duty and his private interest.

Clearly, Levy v. Kansas City is not in point. The contract there could have no innocent aspect. It was entered into with the plain purpose of violating the Criminal Code of Kansas. The contract here in question, in its origin at least, has no taint of illegality. Through changed circumstances it became possible to make use of

it to illegal ends. The question is whether, under the conditions, corruption was so likely to result from the continued operation of this contract that public policy was offended.

Appellant's private interest was no doubt served to an extent by the assignment of patients to the sanitorium, and by their remaining there. It is not so clear that he had a public duty so incompatible with this private interest as to require us to set aside a contract which every principle of justice and of sound policy requires us to enforce, unless restrained by controlling considerations of public policy. Plaintiff's duty and authority as designated examiner have been quoted from the findings. The assignment of patients does not seem to have been within his province. He could only recommend generally that they be placed in contract hospitals. The private advantage likely to ensue upon appellant's making such a recommendation is so remote and indirect as to be hardly recognizable. He might also, if one of appellee's patients was assigned to him for examination, or applied therefor, recommend the discharge of such patient. Thus he might, by a conscienceless disregard of common honesty and professional ethics, serve his own petty ends by refusing to recommend the discharge of one who needed no further treatment. Of course, any physician so disposed could prey upon the public in the same manner. Any city or county health officer, or physician in the service of the government, could do so. When the government requires the services of a physician, it necessarily trusts to his honor not to mulct it in unnecessary fees. The risk of being so mulcted is one which all who employ physicians must run in the ordinary course of business. To the honor of that profession it may be said that it is a risk which need give the public little concern.

Appellant had no power of action or decision. He could only recommend. So he is not in a class with members of city councils or boards of education who endeavor to recover on contracts made with themselves for goods or services. The evil tendency of such contracts is so apparent, and it is such a common abuse, that most courts de-

nounce them. Yet a minority will permit, even in those cases, recovery on quantum meruit where the transaction appears to have been fair and honest. Case note, 9 L. R. A. (N. S.) 1014. The case before us is not an ordinary one. It does not present an example of a widespread evil. The public policy doctrine did not originate in, nor do we think it does or should extend to, such transactions.

If it be considered that this contract is in the nature of one to use personal influence with those in authority in the Public Health Service to procure assignments to appellee's sanitorium, for a compensation contingent upon success in obtaining such assignments, we think that the probability of such form of corruption is equally remote. Though the compensation to appellant is contingent, it is not large, and leaves no room for suspicion that any improper influence or expenditure was intended.

The Supreme Court of the United States holds contracts which apparently contemplate an improper influence upon public officials void. Crocker v. U. S., 240 U. S. 74, 36 S. Ct. 246, 60 L. Ed. 533. And where the compensation to be paid to the negotiating agent is contingent upon success, it has been held that the tendency to corruption is so great that they are to be held necessarily illegal. Providence Tool Co. v. Norris, 2 Wall. 45, 19 L. Ed. 868. Yet where the negotiating agent is one working customarily on commission, and the contingent compensation is such as is usually paid in the ordinary course of business in dealing with the public generally, and there is nothing unusual about the transaction, there is no such tendency and no good reason to attribute bad motives to the parties. Oscanyan v. Winchester Repeating Arms Co., 103 U. S. 261, 26 L. Ed. 539. It was there said by Mr. Justice Field:

"And here it may be observed, in answer to some authorities cited, that the percentage allowed by established custom of commission merchants and brokers, though dependent upon sales made, is not regarded as contingent compensation in the obnoxious sense of that term, which has been so often the subject of animadversion by this court, as suggesting the use of sinister or corrupt means for accomplishing a desired end. They are the rates established by merchants for legitimate services in the regular course of business."

While we think the courts should be sensitive to contracts, the natural tendency of which is corruption of public agents, or the natural inference from which is that such was intended, yet it is not a mere remote possibility of a petty and unnatural graft that warrants a disregard of contracts innocently intended, and probably innocently carried out. We have examined the available texts and many decisions and find no precedent which would point to an affirmance of this judgment.

It appearing to us that upon the findings of fact appellant should have recovered the full amount of his claim, the judgment must be reversed and the cause remanded, with direction to the district court to proceed to enter such judgment.

It is so ordered.

PARKER, C. J., and BICKLEY, J., concur.