FILED
United States Court of Appeals
Tenth Circuit

January 8, 2021

Christopher M. Wolpert
Clerk of Court

UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT
_____

MIDWAY LEASING, INC., a New
Mexico corporation,

      Plaintiff - Appellant/Cross -
      Appellee,

v.

WAGNER EQUIPMENT CO., a
Colorado corporation,

      Defendant - Appellee/Cross -
      Appellant.

Nos. 19-2099 & 19-2108
(D.C. No. 1:18-CV-00132-KBM-KK)
(D. N.M.)

_____

ORDER AND JUDGMENT[*]
_____

Before **TYMKOVICH**, Chief Judge, **LUCERO**, and **BACHARACH**,
Circuit Judges.
_____

This case involves an effort to obtain tax relief through a county's

issuance of industrial revenue bonds. The taxpayer, Wagner Equipment

Company, hired Midway Leasing, Inc. to lobby the county for legislative

approval of the bonds. Midway Leasing prepared the bond application and

---

[*]    This order and judgment does not constitute binding precedent except
under the doctrines of law of the case, res judicata, and collateral estoppel.
But the order and judgment may be cited for its persuasive value if
otherwise appropriate. Fed. R. App. P. 32.1(a); 10th Cir. R. 32.1(A).

met with county officials to support passage. The effort succeeded, and Wagner Equipment obtained the bonds, which resulted in considerable savings in taxes. In light of these savings, Midway Leasing sought payment for its lobbying work. But the parties disputed the amount, and Midway Leasing sued for breach of contract, quantum meruit, and unjust enrichment. For these claims, Midway Leasing alleged a contract for a contingency fee, to be computed as a percentage of Wagner Equipment's tax savings.

On the claim for breach of contract, the threshold issue involves the enforceability of the alleged agreement to pay a contingency fee for legislative lobbying. To assess enforceability, we apply New Mexico law. The New Mexico legislature adopted the common law, which had prohibited enforcement of an agreement to pay contingency fees for legislative lobbying. To date, neither New Mexico's legislature nor its courts have abrogated that prohibition. So the district court properly awarded summary judgment to Wagner Equipment on the claim for breach of contract.

But the district court didn't rule out an award on the claims for quantum meruit and unjust enrichment. On these claims, the court conducted a bench trial and awarded Midway Leasing $175,000 based on what it had charged another taxpayer for similar lobbying efforts. Midway Leasing argues that it was entitled to more, but the district court had

2

discretion to calculate the value to Wagner Equipment based on what another taxpayer had agreed to pay for similar lobbying efforts.

We thus affirm

- the award of summary judgment to Wagner Equipment on the claim for breach of contract and

- the award of $175,000 to Midway Leasing on the claims for quantum meruit and unjust enrichment.

## I.   The district court properly granted summary judgment to Wagner Equipment on the claim for breach of contract.

Midway Leasing challenges the award of summary judgment on the claim for breach of contract, arguing that the alleged contingency-fee agreement was enforceable under New Mexico law. This argument turns on a legal question, so we engage in de novo review. *Campbell v. Bartlett*, 975 F.2d 1569, 1575 (10th Cir. 1992). On de novo review, we must apply New Mexico law, predicting how the New Mexico Supreme Court would decide the issue of enforceability. *Belnap v. Iasis Healthcare*, 844 F.3d 1272, 1295 (10th Cir. 2017). Applying New Mexico law, we conclude that the alleged contingency-fee agreement would have been unenforceable.

### A.   The New Mexico legislature adopted the common law, which had prohibited enforcement of contingency-fee agreements for legislative lobbying.

In 1876, the New Mexico legislature enacted a statute that incorporated the common law. 1876 N.M. Laws, ch. 2, § 2 (now codified as N.M. Stat. Ann. § 38-1-3). Under the statute, the common law effectively

3

filled "every [statutory] crevice, nook and corner . . . in so far as it was applicable to [New Mexico's] conditions and circumstances." *Beals v. Ares*, 185 P. 780, 788 (N.M. 1919).

By 1876, the common law prohibited enforcement of contingency-fee agreements for legislative lobbying. *See* Thomas M. Susman and Margaret H. Martin, *Contingent-Fee Lobbying*, *in The Lobbying Manual: A Complete Guide to Federal Lobbying Law and Practice* 669, 676 (William V. Luneburg et al. ed., 4th ed. 2009) ("The early Supreme Court decisions . . . primarily relied on federal common law to hold the contingent-fee lobbying arrangements void and unenforceable."); *accord* Jack Maskell, Cong. Rsch. Serv., *Lobbying Congress: An Overview of Legal Provisions and Congressional Ethics Rules* 11–12 (2007).[1] For example, the Supreme Court had held that a plaintiff could not recover a contingency fee for lobbying in support of a right of way, explaining that "[a]ll contracts for a

---

[1] The Congressional Research Service explained:

> Although there is no general federal law expressly barring all contingency fees for successful lobbying before Congress, there is a long history of judicial precedent and traditional judicial opinion which indicates that such contingency fee arrangements, when in reference to "lobbying" and the use of influence before a legislature on general legislation, are void from their origin (*ab initio*) for public policy reasons, and therefore would be denied enforcement in the courts.

Jack Maskell., Cong. Rsch. Serv., *Lobbying Congress: An Overview of Legal Provisions and Congressional Ethics Rules* 11–12 (2007).

4

contingent compensation for obtaining legislation . . . [were] void by the policy of law." *Marshall v. Baltimore & O.R. Co.*, 57 U.S. 314, 336 (1853). The Court later repeated the prohibition on enforcing contingency-fee contracts to "procure favors from legislative bodies."[2] *Providence Tool Co. v. Norris*, 69 U.S. 45, 55 (1864); *see Hazelton v. Sheckels*, 202 U.S. 71, 79 (1906) (noting that the Supreme Court had said in *Providence Tool Co.* that "all contracts for a contingent compensation for obtaining legislation were void").

---

[2]     In applying the common law's prohibition, some courts have distinguished between contingency-fee contracts to lobby for legislation involving

- settlement of debts, which may be lawful, and

- "favors," which are unenforceable.

*Brown v. Gesellschaft Fur Drahtlose Telegraphie, M.B.H.*, 104 F.2d 227, 229 (D.C. Cir. 1939); *Comm'r v. Textile Mills Sec. Corp.*, 117 F.2d 62, 65 (3d Cir. 1940); *Hollister v. Ulvi*, 271 N.W. 493, 498 (Minn. 1937). Unlike legislation involving settlement of debts, legislation governing favors serves to provide "advantages or benefits to which, prior to the enactment" the person seeking the legislation had no cognizable claim. *Gesellschaft Fur Drahtlose Telegraphie, M.B.H. v. Brown,* 78 F.2d 410, 413 (D.C. Cir. 1935).

Midway Leasing's lobbying involved favor legislation, not debt legislation, because Wagner Equipment had no prior claim to the bonds. So even in those jurisdictions permitting contingency fees for lobbying on debt legislation, Midway Leasing's alleged agreement would have been unenforceable.

The common law's prohibition was thus absorbed into New Mexico law.[3] Given New Mexico's absorption of the common law, its prohibition on contingency-fee agreements would have remained in place until explicitly abrogated by the courts or the legislature. *See Sims v. Sims*, 930 P.2d 153, 158 (N.M. 1996) ("A statute will be interpreted as supplanting the common law only if there is an explicit indication that the legislature so intended.").

**B.      The prohibition has not been explicitly abrogated.**

Midway Leasing argues that the common law's prohibition has been abrogated by the U.S. Supreme Court, New Mexico courts, and the New Mexico legislature. We disagree, concluding that New Mexico law

---

[3]      The dissent contends that New Mexico embraces a public policy favoring freedom of contract. But all of the cited cases acknowledge other legal limitations on the public policy involving freedom of contract. *See First Baptist Church of Roswell v. Yates Petroleum Corp.*, 345 P.3d 310, 313 (N.M. 2015) ("New Mexico . . . has a strong public policy of freedom to contract that requires enforcement of contracts unless *they clearly contravene some law . . . .*" (emphasis added) (quoting *Berlangieri v. Running Elk Corp.*, 76 P.3d 1098, 1105 (N.M. 2003)); *K.R. Swerdfeger Constr. v. UEM Bd. of Regents*, 142 P.3d 962, 970 (N.M. Ct. App. 2006) (same); *H-B-S P'ship v. Aircoa Hosp. Servs., Inc.*, 114 P.3d 306, 315 (N.M. Ct. App. 2005) (same). The dissent acknowledges that these legal limitations include the bar on contingency-fee agreements for legislative lobbying, which "was absorbed into New Mexico territorial common law in 1876." Dissent at 3–4.

continues to prohibit enforcement of contingency-fee agreements for legislative lobbying.

### 1. The U.S. Supreme Court has not abrogated the prohibition.

Midway Leasing argues in part that this prohibition at common law has withered with the times. For this argument, Midway Leasing points out that

- some pre–1876 opinions by the Supreme Court had prohibited any payment for legislative lobbying and

- payment for legislative lobbying is now considered permissible and protected.

*Compare Providence Tool*, 69 U.S. at 55, *with* Lobbying Disclosure Act of 1995, 2 U.S.C. §§ 1601–1614. Given the current approval of paying lobbyists, Midway Leasing insists that the U.S. Supreme Court has expressly rejected the common law's prohibition on contingency fees for legislative lobbying. We disagree.

Despite the modern era's acceptance of paying lobbyists to influence legislation, we cannot assume that the Supreme Court would overrule its opinions prohibiting contingency-fee agreements for legislative lobbying. *Rodriquez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989). Courts of appeals have thus continued to recognize the Supreme Court's century-old prohibition. *See Fla. League of Pro. Lobbyists, Inc. v. Meggs*, 87 F.3d 457, 462 (11th Cir. 1996) (stating that Supreme Court precedents continue to hold "that contracts to lobby for a legislative result,

7

with the fee contingent on a favorable legislative outcome, were void *ab initio* as against public policy"); *Luff v. Luff*, 267 F.2d 643, 646 (D.C. Cir. 1959) ("Contingent fee arrangements, conditioned on the obtaining of favorable legislation, are unenforceable in the courts."); *Browne v. R & R Engineering Co.*, 264 F.2d 219, 222 (3d Cir. 1959) (noting the existence of "[a] judicially enforced public policy against contingent fees for obtaining legislation").

Midway Leasing also suggests that the Supreme Court has retreated from its earlier precedents. For this suggestion, Midway Leasing relies on five Supreme Court opinions. But none of them cast doubt on the continuing vitality of *Marshall* and *Providence Tool*.

For example, Midway Leasing discusses *United States v. Harriss*, 347 U.S. 612 (1954). There the Supreme Court upheld a federal lobbying disclosure act as constitutional, construing the statute to cover only attempts to influence legislation through direct communication with legislators. *Id.* at 624–25. The Court suggested that a broader statute might have violated the First Amendment's rights "to speak, publish, and petition the Government." *Id.* at 625. So, Midway Leasing argues, the First Amendment protects lobbying. But the Court did not address contingent compensation for lobbying.

The four other cited opinions are even more attenuated. Three did not involve legislative lobbying: *Stanton v. Embry*, 93 U.S. 548 (1876);

8

*Oscanyan v. Arms Co.*, 103 U.S. 261 (1880); and *PanAmerican Petroleum & Transport Co. v. United States*, 273 U.S. 456 (1927). And the fourth opinion did not involve a contingency-fee agreement. *Steele v. Drummond*, 275 U.S. 199 (1927).[4]

\* \* \*

In our view, the Supreme Court hasn't retreated from its nineteenth-century opinions prohibiting enforcement of contingency-fee agreements for legislative lobbying.

**2.     New Mexico courts have not questioned the common law's prohibition on contingency-fee agreements for legislative lobbying.**

Like the U.S. Supreme Court, New Mexico courts have not retreated from the common law's prohibition on contingency-fee agreements for legislative lobbying. Midway Leasing disagrees, referring to three state-court opinions:

1.     *Millspaugh v. McKnab*, 7 P.2d 51 (Kan. 1932),

2.     *Noble v. Mead-Morrison Mfg. Co.*, 129 N.E. 669 (Mass. 1921), and

3.     *Ingalls v. Perkins*, 263 P. 761 (N.M. 1927).

---

[4]     The dissent states that developments in the federal common law after 1876 are irrelevant. Dissent at 9 n.2. For this statement, the dissent apparently assumes that New Mexico would not recognize any developments in the common law after 1876. We need not decide whether this assumption is correct.

Two of the cited opinions involve the law of states other than New Mexico. *See Millspaugh v. McKnab*, 7 P.2d 51 (Kan. 1932); *Noble v. Mead-Morrison Mfg. Co.*, 129 N.E. 669 (Mass. 1921). So those opinions do not address the common law as adopted in New Mexico. *See* N.M. Stat. Ann. § 38-1-3.

Midway Leasing also relies on *Ingalls v. Perkins*, 263 P. 761 (N.M. 1927), but this opinion does not reject the common law's prohibition on contingency fees for legislative lobbying. *Ingalls* instead addresses an individual with dual roles. *Id.* As a physician, the individual served patients at a hospital. *Id*. at 762. And as a public-health official, the individual could refer patients to the hospital. *Id*. Despite the dual roles, the New Mexico Supreme Court upheld the enforceability of the individual's contract with the hospital, observing that

- his compensation depended on the number of referrals to the hospital and

- the government could enter into contracts with agents who customarily work on commission even though the pay was contingent on sales volume.

*Id.* at 763–64**.** But the New Mexico Supreme Court did not address legislative lobbying. *Id.*

Finally, Midway Leasing contends that the conditions in the state have rendered the common law inapplicable. Appellant's Opening Br. at 31; Appellant's Reply Br. at 13. For these conditions, Midway Leasing

10

relies on state statutes; but any statutory abrogation had to be explicit. *See* p. 6, above.

### 3. New Mexico's legislature has not explicitly abrogated the common law's prohibition on contingency fees for legislative lobbying.

Midway Leasing suggests that the New Mexico legislature abrogated the prohibition by adopting N.M. Stat. Ann. § 2-11-8, which bans enforcement of contingency-fee agreements for lobbying the state legislature. The parties agree that the statutory ban does not cover a contingency fee for lobbying at the county level. But Midway Leasing argues that the gap in statutory coverage means that these contingency fees must be enforceable.[5] So we must address whether a statute addressing lobbying at the state level serves to abrogate the common law's prohibition on contingency fees at the county level. We answer "no."

As a general matter, we strictly construe statutes that supplant the common law. *State ex rel. Miera v. Chavez*, 373 P.2d 533, 534 (N.M. 1962). Through strict construction, we interpret a statute "as supplanting the common law only if there is an explicit indication that the legislature

---

[5]     Midway Leasing also contends that the district court interpreted the state statute too broadly. As Midway Leasing observes, the district court found a public policy against contingency fees for legislative lobbying of a county. But this public policy comes from the common law, not the state statute.

so intended." *Sims v. Sims*, 930 P.2d 153, 158 (N.M. 1996); *see* p. 6, above.

The state statute (N.M. Stat. Ann. § 2-11-8) is silent on the lobbying of counties. Midway Leasing argues that this silence suggests disagreement with the state legislature's prohibition, pointing out that the county could have adopted its "own ordinances and regulations governing relations with private parties and lobbyists." Appellant's Opening Br. at 16, 27–28. For example, Midway Leasing points out that the county adopted a code of conduct for lobbying and said nothing there about contingency fees for legislative lobbying. So, Midway Leasing argues, the county must not have wanted to prohibit contingency fees for legislative lobbying.

Midway Leasing's argument is misguided. In the absence of explicit statutory abrogation, the common law continues to prohibit enforcement of contingency-fee agreements for legislative lobbying. Despite the need for explicit abrogation, Midway Leasing has relied in part on the county's silence on contingency fees for lobbying of counties. Silence alone couldn't constitute an explicit abrogation of the common law's prohibition. *See Atherton v. Gopin*, 355 P.3d 804, 810–11 (N.M. Ct. App. 2015) (stating that statutory silence on a subject couldn't abrogate the common law); *Gonzales v. Whitaker*, 643 P.2d 274, 278 (N.M. Ct. App. 1982) (concluding that state statutes didn't abrogate the common law because the statutes had been silent on the subject).

12

Midway Leasing also argues that the state legislature abrogated the common law's prohibition by adopting N.M. Stat. Ann. § 2-11-8. This section prohibits "lobbying" compensation contingent on "state" legislation. *Id.* The statute defines "lobbying" to include attempts to influence "an official action." N.M. Stat. Ann. § 2-11-2(D). The term "official action" refers to "the action or nonaction of *a state official or state agency, board or commission* acting in a rulemaking proceeding." N.M. Stat. Ann. § 2-11-2(G) (emphasis added).

Midway Leasing interprets this reference to a "board or commission" to include a county's boards or commissions. Based on this interpretation, Midway Leasing contrasts this broad definition with the specific prohibition against contingency fees for lobbying of the state legislature. In Midway Leasing's view, the difference in statutory breadth reflects abrogation of the public policy against contingency fees for legislative lobbying at the county level. This interpretation improperly disregards grammar, common sense, the statutory context, and the necessity of explicit abrogation.

Midway Leasing bases its argument on this series: "a state agency, board, or commission." N.M. Stat. Ann. § 2-11-12(G). The series consists of three nouns, all various forms of a public entity:

- "agency"

- "board"

13

- "commission"

The first item in the series ("agency") is preceded by an adjective: "state." Given the placement before the noun "agency," the word "state" is a "prepositive adjective." Bryan A. Garner, *The Chicago Guide to Grammar, Usage, and Punctuation* 463 (2016).

Prepositive adjectives ordinarily apply to each noun in a series involving "a straightforward, parallel construction." *Alpern v. Ferebee*, 949 F.3d 546, 550 (10th Cir. 2020) (quoting *Potts v. Ctr. for Excellence in Higher Educ., Inc.*, 908 F.3d 610, (10th Cir. 2018)). For example, when we interpret the Fourth Amendment's reference to "unreasonable searches and seizures," we intuitively apply the prepositive adjective ("unreasonable") to both nouns in the series ("searches and seizures"). The same is true here: The prepositive adjective "state" modifies each noun in the parallel series: "agency, board or commission." As a matter of grammar, then, the statute refers to a state agency, state board, or state commission.

This grammatical construction reflects common sense. Why would the legislature adopt a statute regulating county "boards" or "commissions," but not county "agencies"? The legislature obviously intended to regulate state entities regardless of whether they identified themselves as "boards," "commissions," or "agencies." Midway Leasing's

14

contrary construction of the statute disregards not only grammar but also common sense.

Midway Leasing's construction also disregards the context of § 2-11-8(G). This section appears in the Lobbyist Regulation Act, N.M. Stat. Ann. §§ 2-11-1 to 2-11-9, which is part of Chapter 2 of the New Mexico Statutes. The chapter concerns the legislative branch of state government but does not address county government. County governments are addressed in a different chapter (Chapter 4). Given the context of Chapter 2, the statutory term "board or commission" refers only to the *state's* boards and commissions, not the *counties'* boards and commissions.

But even if the state statute had defined "lobbying" to encompass efforts to influence county commissions, the statute didn't address contingency fees for lobbying counties. Nor does Chapter 4 of the New Mexico Statutes, which pertains to county governments. So even under Midway Leasing's interpretation, New Mexico statutes would have been silent on contingency fees for county legislation. And silence alone doesn't constitute explicit abrogation of the common law's prohibition on contingency fees for legislative lobbying. *See* pp. 11–12, above.

\* \* \*

New Mexico adopted the common law, which had prohibited enforcement of the alleged contingency-fee agreement. That prohibition was not explicitly abrogated, so the district court acted properly in

15

awarding summary judgment to Wagner Equipment on the breach-of-contract claim.[6]

## II. The district court did not abuse its discretion in awarding $175,000 to Midway Leasing for quantum meruit and unjust enrichment.

Midway Leasing also challenges the award of $175,000 for quantum meruit and unjust enrichment on two grounds:

1. The court should have declined to consider whether the parties had reached a meeting of the minds on payment of a contingency fee.

2. The district court should have considered Wagner Equipment's agreements with other tax consultants.

We reject both arguments.

We conclude that the district court didn't err by considering whether the parties had a meeting of the minds. Under New Mexico law, the absence of a meeting of the minds bears on the claims for quantum meruit

---

[6]    The dissent states that allowance of contingency fees wouldn't be bad. We express no opinion on the desirability of contingency fees for legislative lobbying. The issue isn't whether New Mexico's public policy is good or bad; we instead must decide only

- whether the common law is inapplicable to the New Mexico conditions and

- whether the New Mexico legislature has explicitly abrogated the common law's prohibition.

It's not our role to decide whether the bar on contingency fees is good or bad.

and unjust enrichment: If the parties have not agreed on the terms of payment, the court can consider other ways to measure the value to Wagner Equipment. *See Hydro Conduit Corp. v. Kemble*, 793 P.2d 855, 857 (N.M. 1990). So the court's first task was to decide whether the parties had agreed on the payment terms.

In carrying out this task, the court found that the parties hadn't agreed. Despite the absence of an agreement, the court recognized that Midway Leasing was entitled to payment for the value of its work to Wagner Equipment. Because the parties hadn't agreed on how to measure the value of those services, the court appropriately considered other possible measurements. *See* Restatement (Third) of Restitution and Unjust Enrichment § 49 cmt. f (2011).

To measure the value, Midway Leasing argues, the district court should have relied on Wagner Equipment's contingency-fee agreements with other tax consultants. In addressing this argument, we apply the abuse-of-discretion standard. *Davoll v. Webb*, 194 F.3d 1116, 1139–40 (10th Cir. 1999). A court abuses its discretion when it commits a legal error. *State v. Oppenheimer & Co.*, 447 P.3d 1159, 1163 (N.M. 2019). In our view, the court had the discretion to measure the value to Wagner Equipment based on the flat fee that Midway Leasing had charged another client for similar work. *See Cano v. Lovato*, 734 P.2d 762, 777 (N.M. Ct. App. 1986).

17

Opting for the flat-fee approach, the district court considered one project especially telling: Midway Leasing's president, Mr. D. McCall, had obtained a $175,000 fee for similar consulting work on behalf of another company. The district court could reasonably rely more heavily on this flat-fee contract than on the contingency-fee contracts with tax consultants. The court thus had discretion to use the flat-fee contract when measuring the value to Wagner Equipment. *See id.*

## III.   We affirm the district court's rulings.

We affirm (1) the grant of summary judgment to Wagner Equipment on the contract claim and (2) the $175,000 award on the claims involving quantum meruit and unjust enrichment.[7]

Entered for the Court


Robert E. Bacharach
Circuit Judge

---

[7]     Wagner Equipment cross-appealed, arguing that the award of $175,000 in restitution to Midway Leasing was excessive. But Wagner Equipment asked us to consider the cross-appeal only if we were to remand to the district court. Because we are not remanding, we do not consider the cross-appeal.

19-2099 and 19-2108, *Midway Leasing Inc. v. Wagner Equipment Co.*
Tymkovich, Chief Judge, dissenting

By statutory enactment, the New Mexico legislature abrogated the public policy against contingent fee contracts or success bonuses of the kind at issue here. I would remand the case for a ruling on the existence and terms of the arrangement between Midway and Wagner. I accordingly dissent as to Part I of the majority opinion, but concur as to Part II.

## I. Background

This diversity appeal arises out of a partially formed agreement between Midway Leasing Inc. and Wagner Equipment Co. for services from Midway to help develop Wagner's newly acquired property in New Mexico. During Wagner and Midway's dealings, Wagner decided to apply for industrial revenue bonds. Wagner and Midway reached a verbal agreement for Midway to perform many tasks associated with obtaining the IRBs, including composing the application, meeting with and lobbying county commissioners, and negotiating IRB terms. These tasks were crucial to obtaining the IRBs because the bonds are only issued upon a favorable vote and the enactment of an ordinance authorizing the issuance of the bonds by the county commissioners. Midway held up its end of the bargain and the IRBs were issued to Wagner. The parties never got around to discussing compensation for these services until Midway's performance was more or less complete. The parties disputed compensation, which led Midway to file suit against Wagner for breach of contract and unjust enrichment.

1

Midway contends Wagner contracted to pay 18 percent of Wagner's tax savings resulting from the IRBs over the next thirty years—over $3 million. Wagner filed a motion for summary judgment asserting that the alleged contingency fee agreement for lobbying the county commissioners to approve the issuance of IRBs to Wagner violates New Mexico public policy and is thus void. The district court agreed with Wagner. It found New Mexico's public policy against contingency fee agreements for legislative lobbying—adopted from *Providence Tool v. Norris*, 69 U.S. 45 (1864)—has not been abrogated by any New Mexico law or judicial decision and thus voids the contingency fee contract to lobby the county commissioners.

The majority also reaches this conclusion by affirming the district court, but I conclude the New Mexico legislature has abrogated this public policy.

## II. The New Mexico Legislature Abrogated the Public Policy Described in *Providence Tool*

In concluding that the alleged contract violates New Mexico public policy, the majority rejects the state legislature's clear abrogation of the century-old public policy against contingency fee agreements for legislative lobbying.

In a diversity action, if "the state's highest court has not decided the issues presented, [the panel] may . . . predict how it would rule." *Koch v. Koch Indus., Inc.*, 203 F.3d 1202, 1230 (10th Cir. 2010). Although making this prediction in the absence of guidance from the New Mexico Supreme Court necessarily requires some guessing, we should be mindful that "as a federal court, we shouldn't expand New Mexico law in a

2

manner that the state courts have not." *Herndon v. Best Buy Co.,* 634 F. App'x 645, 648 (10th Cir. 2015) (unpublished) (internal quotation marks omitted).  Moreover, if the state legislature has answered the question for us, we should not ignore its direction.

This case requires us to predict how the New Mexico Supreme Court would weigh competing public policies (1) in favor of freedom of contract, and (2) against contingency fee agreements for legislative lobbying.

New Mexico has a strong public policy in favor of freedom of contract.  *See First Baptist Church of Roswell v. Yates Petroleum Corp.*, 345 P.3d 310, 313 (N.M. 2015). This public policy "requires enforcement of contracts unless they *clearly contravene* some law or rule of public morals." *Berlangieri v. Running Elk Corp.*, 76 P.3d 1098, 1105 (N.M. 2003) (internal quotation omitted) (emphasis added); *see also H-B-S P'ship v. Aircoa Hosp. Servs., Inc.*, 114 P.3d 306, 315 (N.M. Ct. App. 2005).  In some instances, New Mexico courts require a contract to violate an "explicit public policy expressed in a statute or judicial decision" in order to override the public policy of freedom of contract and be deemed void.  *K.R. Swerdfegar Constr. v. UNM Bd. of Regents*, 142 P.3d 962 (N.M. Ct. App. 2006).[1]

---

[1]  The majority opinion faults the dissent for focusing on New Mexico's public policy of freedom of contract which is limited by "the bar on contingency-fee agreements for legislative lobbying."  Maj. Op. at 5 n.2.  But that is not how I read New Mexico's case law.  Instead, New Mexico embraces public policies for freedom of contract and against contingent fee agreements for legislative lobbying.  And when public policies conflict, the court must accommodate the two as best we can.  I conclude that New Mexico courts would find that its public policy against contingent fee agreements for legislative lobbying should give way to its public policy for freedom of contract for the reasons explained below.

3

The competing New Mexico public policy central to this case is a bar on contingency fee agreements for legislative lobbying. This public policy was announced by the United States Supreme Court in *Providence Tool* in 1864 and was absorbed into New Mexico territorial common law in 1876. *See Lopez v. Maez*, 651 P.2d 1269, 1273 (N.M. 1982). But *Providence Tool*'s analysis is of limited utility even if the United States Supreme Court would still endorse it. The limited question before the *Providence Tool* Court was whether the payment of contingency fees to a third party for the purpose of securing a government contract to furnish it with civil war supplies was void as against public policy. But the Supreme Court's reasoning for answering affirmatively was expansive:

> [A]ll agreements for pecuniary considerations to control the business operations of the Government, or the regular administration of justice, or the appointments to public offices, or the ordinary course of legislation, are void as against public policy, without reference to the question, whether improper means are contemplated or used in their execution. The law looks to the general tendency of such agreements; and it closes the door to temptation, by refusing them recognition in any of the courts of the country.

*Providence Tool*, 69 U.S. at 55–56. This reasoning suggests that *any* contract for compensation to influence the government violates public policy, including but not limited to contingency fee agreements for legislative lobbying.

The New Mexico Supreme Court has offered no guidance on how to weigh these competing public policies. But we have direct guidance from another source: the New Mexico legislature. In 1978, the legislature enacted the Lobbyist Regulation Act. The

4

Act prohibits contingency fee agreements to lobby the *state* legislature or governor. *See* N.M. Stat. § 2-11-8 (2020) ("No person shall accept employment as a lobbyist and no lobbyist's employer shall employ a lobbyist for compensation contingent in whole or in part upon the outcome of the lobbying activities before the legislative branch of state government or the approval or veto of any legislation by the governor."). This Act explicitly incorporates in New Mexico law only a small portion of the broader public policy announced in *Providence Tool*—only codifying that policy *as to the lobbying of the state legislature or governor*. With § 2-11-8, then, the New Mexico legislature abrogated *Providence Tool* by entering and regulating the lobbying business. But it chose to do so only at the state level and only for a certain form of compensation, permitting less regulation for lobbying of local government actors. This is evidenced not only by the express language of the Act, but also by the legislature's silence.

The legislature could have statutorily condemned contingency fee agreements to lobby local government actors—but did not. Chapter 2 of the New Mexico statutes governs the legislative branch. It explicitly prohibits contingency fee agreements to lobby state government actors. Chapter 4, on the other hand, governs counties. And unlike Chapter 2, Chapter 4 does not include a prohibition of contingency fee agreements to lobby local government actors. It therefore follows that the New Mexico legislature intentionally overrode the public policy against these agreements as to local government actors. And even outside the context of the these chapters, the New Mexico legislature

5

could have enacted a statute expressly prohibiting contingency fee agreements to lobby local government actors—but did not.

The New Mexico legislature was clear that only contingency fee agreements to lobby the state legislature or governor violate the law and contravene public policy. Its silence in the Lobbyist Regulation Act and all other statutes about contingency fee agreements to lobby any other government actor confirms the legislature's intent to narrow the *Providence Tool* public policy and permit contingency contracts to lobby local government actors.

The majority rejects this legislative silence and instead relies heavily on the lack of explicit language repealing New Mexico's broad public policy against contingency fee agreements for legislative lobbying. But this gets it backwards. It is the New Mexico public policy in favor of freedom of contract that "requires enforcement of contracts unless they *clearly contravene* some law or rule of public morals." *Berlangieri*, 76 P.3d at 1105 (internal quotation omitted) (emphasis added). And here, the New Mexico legislature is clear that contingency fee agreements for legislative lobbying of local government actors does not violate public policy or it would have said so. At the very least, the New Mexico legislature's specific prohibition of contingency fee agreements to lobby the state legislature or governor muddies the waters enough such that the same agreements to lobby local government actors do not "clearly contravene some law or rule of public morals." *Id*.

6

Such an outcome here would not be a bad thing. Contingency fee arrangements are not inherently evil. The modern lobbying business (or lawyering where contingency fees are even more popular) does not "suggest the use of sinister and corrupt means for the accomplishment of the end desired." *Providence Tool*, 69 U.S. at 55. Contingency fee arrangements are standard operating procedure in modern-day contracts, enabling freely contracting parties to agree that payment will be due upon the achievement of an objective, which generally facilitates the agreed upon payment. Put another way, contingency fee arrangements allow parties to contract with future money. To be sure, they incentivize a party to achieve an objective so he or she will get paid. But such an incentive is just as prevalent in other compensation arrangements. For example, even if parties enter into a fixed compensation agreement, if one party collects payment but does not perform his end of the bargain, the other party will not shrug it off and move on—you can bet a demand of repayment. So, the party paid up front has an incentive to perform in order to keep his money as much as the party paid on a contingency basis has an incentive to perform to receive his money.

Because a party could hypothetically be incentivized to use corrupt means to achieve a contract's objective does not mean the contract is inherently evil, nor should it be conclusive on the point. If that were true, many contracts could be said to violate public policy. Other courts have reached similar conclusions, refusing to condemn contingency fee arrangements as inherently evil, even when they involve influencing the government. *See, e.g.*, *Hall v. Anderson*, 140 P.2d 266, 270 (Wash. 1943) ("It will not do

7

to hold that public policy forbids one to employ an agent to represent him in dealing with the government when, as far as the facts show, the employment contemplates an appeal to the government agency on the merits, as distinguished from the use of some species of direct or oblique personal influence."); *Noble v. Mead-Morrison Mfg. Co.*, 129 N.E. 669, 674 (Mass. 1921) ("The question of the legality of the contract in each case is to be determined by weighing all the elements involved and then deciding whether its inherent tendency is to invite or promote the use of sinister or corrupt means to accomplish the end or to bring influences to bear upon public officials of any other nature than the single one of genuine advantage to the government.").

Moreover, other state legislatures have gone as far as expressly permitting legislative lobbying based on contingency fee arrangements, just as I read New Mexico law to do at the local level. *See* W. Va. Code Ann. § 6B-3-1(6) (defining "lobbying" as "the act of communicating with a government officer or employee to promote, advocate or oppose or otherwise attempt to influence [executive or legislative actions]"); *id*. § 6B-3-2(a)(4) (requiring lobbyists, as part of registration, to state whether their compensation "is or will be contingent upon the success of his or her lobbying activity"); Del. Code Ann. tit. 29, § 5834 (permitting half of a lobbyist's compensation to be contingent on "the outcome of any legislative or administrative action"). And there is also no blanket federal ban on lobbying Congress for contingency fees. *See generally* 2 U.S.C. § 1601 *et seq*. Like these authorities, the New Mexico legislature determined legislative lobbying for contingency fees is not inherently evil, and the majority should

8

not credit *Providence Tool*'s overstated and unrealized warning about corruption inherent in contingency fee agreements.

In sum, the New Mexico legislature narrowed the overly broad public policy announced in *Providence Tool* by enacting § 2-11-8 which prohibits only contingency fee agreements to lobby the state legislature or governor. The legislature's silence as to all other contingency fee agreements for lobbying—including lobbying of local government actors—necessarily permits such agreements and abrogates any public policy to the contrary.

Accordingly, I conclude the alleged contingency fee agreement between Midway and Wagner to lobby the county commissioners does not violate New Mexico public policy and is thus enforceable. Although I dissent in that respect, I join the majority in full in its conclusion that the district court did not abuse its discretion in its damages award.[2]

---

[2] The majority focuses much of its analysis on distinguishing federal cases regarding contingent fee agreements for legislative lobbying *after* New Mexico adopted the federal common law to show that the federal common law still prohibits such agreements. *See* Maj. Op. at 6–9. But New Mexico absorbed the common law as it was in 1876, not as it was in 1876 and any subsequent developments. So, later rulings by federal courts are not automatically incorporated into New Mexico law, and the majority's focus on subsequent developments in federal common law is irrelevant.

9